UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY DURLEY,

                            Plaintiff,

            v.                                      Case No. 21-cv-1263-pp

CHERYL JEANPIERRE, *et al.*,

                            Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 62) AND DENYING
PLAINTIFF'S MOTION FOR SANCTIONS (DKT. NO. 85)**

        Plaintiff Timothy Durley, who is representing himself, is proceeding
under 42 U.S.C. §1983 on Eighth Amendment claims against prison officials at
Waupun Correctional Institution. The defendants have moved for summary
judgment. Dkt. No. 62. The plaintiff opposes their motion, dkt. no. 78, and
moves for sanctions against the defendants, dkt. no. 85. The court will deny
the plaintiff's motion for sanctions, grant in part and deny in part the
defendants' motion for summary judgment and dismiss defendants Robert
Weinman and Robert Rymarkiewicz.

**I.      Facts**

        A.      Procedural Background

        On November 1, 2021, the court received the plaintiff's complaint
asserting that the defendants had violated his rights under the Eighth
Amendment. Dkt. No. 1. The court also received from the plaintiff two motions
for injunctive relief, dkt. nos. 4, 9, and various declarations in support of those
motions, dkt. nos. 3, 5, 7. The court screened the complaint and allowed the

plaintiff to proceed on Eighth Amendment claims against Dr. Cheryl Jeanpierre, nurse Dixie Berres, Health Services Unit (HSU) Manager Robert Weinman and Captain Robert Rymarkiewicz. Dkt. No. 20. The court denied the plaintiff's motions for a preliminary injunction. Id. at 13–18.

On July 26, 2022, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 24. The court later stayed the deadline for dispositive motions pending a decision on the plaintiff's motion to compel discovery. Dkt. No. 49. On June 11, 2023, the court denied the motion to compel. Dkt. No. 55. Three days later, the court set a new deadline of August 14, 2023 for the parties to file dispositive motions. Dkt. No. 56.

Later in June 2023, the plaintiff filed motions "to withdraw and amend admissions," for an extension of time to conduct additional discovery and to again stay the dispositive motions deadline. Dkt. Nos. 57–59. The court construed the plaintiff's motion to withdraw and amend admissions as a motion to withdraw and amend his requests for admissions and denied all three of the plaintiff's motions. Dkt. No. 61. The court advised the parties that the dispositive motion deadline remained August 14, 2023. Id. at 4.

At that deadline, the defendants filed their motion for summary judgment and materials in support. Dkt. Nos. 62–68. The next day, the court ordered the plaintiff to file his response to the defendants' motion by the end of the day on September 13, 2023. Dkt. No. 69. The court later granted the plaintiff's request to extend that deadline to respond to the defendants' motion and ordered him to file his response materials by January 24, 2024. Dkt. No. 72. On September 19, 2023, the court denied the plaintiff's request for leave to file additional proposed facts in response to the defendants' summary

2

judgment motion. Dkt. No. 74. The court observed that the plaintiff had stated his intent "to file 'over a hundred exhibits' in support of his response." Id. (quoting Dkt. No. 72 at 2). The court advised the plaintiff "to carefully review his response materials and to decide which of his exhibits and additional statements of fact are necessary." Id.

On October 30, 2023, the court received the plaintiff's response materials to the defendants' summary judgment motion (more than three months before his extended deadline). Dkt. Nos. 78–83. On November 6, 2023, the court received the plaintiff's motion for sanctions. Dkt. No. 85. The defendants filed their response to the plaintiff's proposed findings of fact, dkt. no. 91, and their reply brief in support of their motion, dkt. no. 90. That completed the briefing on the summary judgment motion.

On November 20, 2023, the court received the plaintiff's motion asking the court to return documents he mailed in support of his opposition to the defendants' summary judgment motion. Dkt. No. 92. The court denied that motion, explaining that the plaintiff "is not entitled to have the documents he filed returned to him free of charge" and instead "must pay for copies of his mailed and filed documents." Dkt. No. 93 at 3. On December 11, 2023, the court denied the plaintiff's motion to reconsider its order denying his request for the return of his documents. Dkt. No. 95. The court reiterated that the plaintiff must pay for copies of any documents that he wants returned to him. Id.

B.     Factual Background

1.     *The Complaint*

The plaintiff filed his complaint on the court's form for incarcerated persons proceeding without an attorney. Dkt. No. 1. The plaintiff signed his

complaint and "declare[d] under penalty of perjury that" its contents are "true and correct." Id. at 8. The court treats the verified complaint as "the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017) (quoting Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996)).

The court detailed the complaint's allegations in the screening order:

> [The plaintiff] alleges that on July 13, 2021, he notified Jeanpierre, Weinman and Rymarkiewicz that he had gone on a hunger strike. On July 26, 2021, he began a water strike and notified the same defendants. A few days later, on July 29, 2021, the plaintiff passed out while walking around the RHU [Restricted Housing Unit] and hit his head on the cell door. He awoke in the nurse's station, where defendants Jeanpierre, Berres and Rymarkiewicz were "laughing, poking [his] face, saying do[es] this hurt." . . . Jeanpierre allegedly pointed out that the officers' body cameras were not on and asked whether the officers should keep the plaintiff at the prison or send him to the hospital; the plaintiff says she said this three times. Rymarkiewicz allegedly responded, "[F]uck it let[']s keep him here." The plaintiff alleges that the defendants did not provide him medical treatment for his head injuries, did not perform a CAT scan or other tests to determine the extent of his injury and did not give him an ice bag for his head.

> The plaintiff was taken in a wheelchair in the strip cell area in the RHU. The plaintiff asked Rymarkiewicz if he would loosen the plaintiff's handcuffs, which he says were too tight. Rymarkiewicz denied that request and walked off, leaving the plaintiff handcuffed to the wheelchair for over two and a half hours. The plaintiff informed Weinman of everything that had occurred, including severe pain in his head and pain in his wrists, but Weinman did nothing. On August 17, 2021, the plaintiff saw Berres to assess his ongoing hunger strike and water strike. He asked her to adjust his pain medications, which he received before hitting his head, because they were not working for his head pain. Berres refused to do anything unless the plaintiff allowed her to assess his hunger strike and water strike. The plaintiff said, "no get a court order," and Berres said the doctor would get one. She again told the plaintiff that she wouldn't see him for his pain from hitting his head unless the plaintiff allowed her to assess his hunger strike and the plaintiff again said no. Berres ended the appointment.

4

Dkt. No. 20 at 3–5 (internal citations omitted). The court analyzed the plaintiff's allegations and allowed him to proceed on three Eighth Amendment claims:

> 1) deliberate indifference for providing inadequate medical treatment against Jeanpierre and Berres; 2) deliberate indifference to the plaintiff's need for medical attention or treatment against Rymarkiewicz and Weinman; and 3) excessive force against Rymarkiewicz.

Id. at 12–13.

2. *Defendants' Proposed Facts*

The plaintiff was incarcerated at Waupun at all relevant times. Dkt. No. 64 at ¶1. The defendants were employees at Waupun; Dixie Berres was a Nurse Clinician, Cheryl Jeanpierre was a physician, Robert Weinman was the Nursing Supervisor/Health Services Manager and Robert Rymarkiewicz was (and remains) a Supervising Officer/Captain. Id. at ¶¶2–5.

Berres avers that as a nurse, she provided care to patients at Waupun by assessing and treating them, assisting physicians, managing medications, providing emergency care and maintaining medical records. Dkt. No. 67 at ¶3. As a physician, Jeanpierre diagnosed and treated incarcerated persons and arranged for professional consultation when warranted. Dkt. No. 68 at ¶5. Weinman held an administrative position as Manager of the HSU; in that role he managed and supervised health care services at Waupun, monitored care plans, prepared reports and acted as liaison to other prison units and community health care providers. Dkt. No. 65 at ¶3. He supervised staff but not physicians or advanced treating providers. Id. at ¶4. Weinman is not a doctor, did not provide care to the plaintiff and does not have the authority to override decisions of physicians or other advanced providers. Id.; Dkt. No. 82-1 at 23. As a captain, Rymarkiewicz is responsible for supervising correctional officers,

directing staff on his shift and supervising and treating incarcerated persons. Dkt. No. 66 at ¶3.

a.     July 29, 2021 Incident

At around 10:00 a.m. on July 29, 2021, a sergeant told Rymarkiewicz that the plaintiff had fallen in his cell and was not responding. Dkt. No. 64 at ¶10. Rymarkiewicz rushed up the stairs to the plaintiff's cell, where he saw the plaintiff lying on his stomach. Id. at ¶¶10–11. Rymarkiewicz called to the plaintiff, but the plaintiff was unconscious and did not respond. Id. at ¶11. Rymarkiewicz ordered an emergency cell entry, and the sergeant and four correctional officers donned protective gear for entry. Id. at ¶¶11–12. The officers entered the plaintiff's cell without incident, placed restraints on the plaintiff's wrists and ankles and moved him to a wheelchair to take him to a treatment room. Id. at ¶13. The plaintiff remained unconscious. Id. Rymarkiewicz avers that the officers restrained the plaintiff in case he regained consciousness because he has a history of assaulting staff and was housed in the RHU, which "is the most dangerous unit in Waupun." Dkt. No. 66 at ¶13. Rymarkiewicz did not observe "blood, swelling, a gash, or any serious injuries" on the plaintiff. Id. at ¶14.

Berres was working in the HSU on July 29, 2021, when she learned that the plaintiff had fallen in his cell. Dkt. No. 64 at ¶16. She, Jeanpierre and Weinman also ran from the HSU to the RHU to examine and treat the plaintiff. Id. at ¶17. Weinman avers that he served as back-up to Jeanpierre because of the plaintiff's history of assaulting staff. Dkt. No. 65 at ¶11. Weinman did not assess the plaintiff or provide him care. Id. at ¶12.

Berres assessed the plaintiff and found him alert and able to respond to her questions with sentences, phrases and words. Dkt. No. 64 at ¶¶19–21; Dkt.

No. 65-2 at 5. She noted that the plaintiff's eyes were "fluttering, but he refused to open them," which allowed Berres to conclude that the plaintiff was conscious. Dkt. No. 65-2 at 5; Dkt. No. 67 at ¶16. The plaintiff did not allow Berres to check his blood pressure. Dkt. No. 65-2 at 5; Dkt. No. 67 at ¶15. Berres says Jeanpierre suggested administering intravenous (IV) fluids because the plaintiff had been on a hunger and water strike, but the plaintiff refused the fluids. Dkt. No. 65-2 at 5–6; Dkt. No. 67 at ¶17. Jeanpierre avers that only a physician can order intravenous fluids, and the patient must consent to receive them unless he is unconscious or otherwise cannot consent. Dkt. No. 68 at ¶¶29–30.

The plaintiff told Berres that he hit his cheek bone on the ground when he fell. Dkt. No. 65-2 at 5; Dkt. No. 67 at ¶11. Berres observed redness around his left cheek bone; but she did not observe swelling, bruising, bleeding or a gash or bump. Dkt. No. 65-2 at 5; Dkt. No. 67 at ¶12. The plaintiff did not complain of pain. Dkt. No. 65-2 at 5. Berres avers that she was able to obtain only the plaintiff's temperature, respiratory rate and pulse before he refused further tests. Dkt. No. 67 at ¶13. She avers that his vitals were normal except for his heart rate, which she noted was slightly elevated because of "the current situation." Id. at ¶14; Dkt. No. 65-2 at 7. Weinman avers that he did not see any signs of serious injury to the plaintiff. Dkt. No. 65 at ¶14.

Jeanpierre does not independently recall treating the plaintiff on July 29, 2021, there is no treatment order in the plaintiff's medical records showing that Jeanpierre treated him and she does not enter treatment orders if a patient refuses treatment. Dkt. No. 68 at ¶¶8, 11–12. She reviewed Berres's notes from the assessment, which do not show her name but state, "Provider and HSM [Health Services Manager] present." Id. at ¶¶9–10. Jeanpierre notes

that the plaintiff's "fluttering eyes" may mean that he was having a seizure "or faking unconsciousness." Id. at ¶21. But because Berres had noted that the plaintiff had refused to open his eyes, Jeanpierre believes that the plaintiff "had control over closing and opening his eyes, and he was not having a seizure." Id. at ¶22. She observes that Berres's assessment also does not suggest that the plaintiff bit his tongue, which also could indicate that he had had a seizure. Id.

Berres reiterates that the plaintiff was responding to her questions, that his vitals were mostly within normal ranges and that he was not confused, stuporous or lethargic. Dkt. No. 67 at ¶18. Based on this information, Berres concluded that the plaintiff had not suffered a serious head injury and did not face an excessive risk to his health or safety. Id. Because he refused fluids and showed no signs of having suffered a serious head injury, Berres completed a DOC-3220 form noting that the plaintiff had refused recommended health care and ended the visit. Id. at ¶19; Dkt. No. 65-2 at 6. She notes that the plaintiff could not sign the form because he was still handcuffed. Dkt. No. 67 at ¶19. Jeanpierre agrees with Berres's assessment and her decision to end the visit after the plaintiff refused further care. Dkt. No. 68 at ¶¶27–28. She notes that Berres's assessment does not suggest that the plaintiff showed signs of a serious head injury, such as "altered mentation, confusion, slurred speech, or unsteady gait." Id. at ¶26. She notes that because the plaintiff's condition did not appear to be life-threatening, Berres could not force him to receive care. Id. at ¶28. Both Berres and Jeanpierre deny laughing at the plaintiff, poking him or saying "does this hurt." Dkt. No. 67 at ¶21; Dkt. No. 68 at ¶32.

After Berres ended the assessment, security took the plaintiff to a strip cell where staff could monitor him closely. Dkt. No. 64 at ¶33; Dkt. No. 65-2 at 5. Weinman avers that he did not refuse the plaintiff medical attention while

the plaintiff was in the strip cell. Id. at ¶52. He says that while the plaintiff was in the strip cell, Weinman was not made aware that the plaintiff needed medical attention. Id. at ¶53.

### b. Rymarkiewicz Involvement

Rymarkiewicz avers that it was his decision to take the plaintiff to the strip cell area to ensure that he received continuous observation for his safety. Dkt. No. 66 at ¶16. He says that staff maintain constant observation of the strip cells from the control bubble, which is an enclosed workstation with windows on all sides. Id. at ¶17. Rymarkiewicz explains that as a captain, he defers to medical treatment decisions made by HSU staff. Id. at ¶18.

Rymarkiewicz avers that he did not say, "Let's keep him here" while the plaintiff was in the treatment room on July 29, 2021. Id. at ¶19. He avers that he did not laugh at the plaintiff, poke him or say "does this hurt" during the assessment. Id. at ¶20. Rymarkiewicz is not sure how long the plaintiff remained in the strip cell, but the plaintiff remained under constant observation and was not left unattended. Id. at ¶21. Rymarkiewicz cites Exhibit 1003, which is July 29, 2021 footage taken from the stationary camera in the strip cell area. Id. at ¶22 (citing Dkt. No. 66-2). He says that he and other officers returned to check on the plaintiff at least three times while the plaintiff was in the strip cell. Id. at ¶24.[1] After about an hour, Rymarkiewicz had officers wheel the plaintiff out of his cell so that Rymarkiewicz could speak with the plaintiff face-to-face. Id. at ¶25 (citing Dkt. No. 66-3 at 11:09:28–11:10:00).

_____

[1] Around this point in the plaintiff's response to the defendants' proposed facts, the page numbers at the bottom jump from 22 to 47. Dkt. No. 80 at 21. There also is no page 20 or page 67. But the plaintiff reiterates everything he says in this document in his declaration, his response brief and his own proposed facts.

The plaintiff told Rymarkiewicz that he was having difficulty breathing in his cell, but that the strip cell was cooler than his cell on the RHU. Id. at ¶26. Rymarkiewicz allowed the plaintiff to remain in the cooler strip cell and wheeled him back inside. Id. Rymarkiewicz returned to the strip cell about ten minutes later with another supervising officer to ensure that the plaintiff was not in distress when breathing. Id. at ¶27. Rymarkiewicz avers that he did not notice the plaintiff struggling to breathe. Id.

Rymarkiewicz avers that he did not believe that the plaintiff faced an excessive risk to his health or safety in the strip cell. Id. at ¶28. He recounts that the plaintiff was conscious, verbal and not in distress. Id. He also says that HSU staff had medically cleared the plaintiff. Id. After Rymarkiewicz determined that the plaintiff's condition was stable, he ordered officers to remove the plaintiff from the strip cell area and return him to his cell. Id. at ¶30.

Rymarkiewicz says that it is necessary to place an incarcerated person in restraints when transferring him out of his cell to prevent injury to staff or other incarcerated persons. Id. at ¶37. He asserts that because the plaintiff was in the RHU and had a history of assaulting staff, he had to take extra precautions. Id. Rymarkiewicz denies securing the plaintiff's handcuffs tightly. Id. at ¶32. He avers that he does not recall the plaintiff telling him that the handcuffs were too tight. Id. at ¶33. Rymarkiewicz says that he is trained to secure handcuffs "properly," which means they "must be tightened to a degree to be effective." Id. at ¶34. He knows that tight handcuffs can cause pain and injury, and he says that he would have adjusted the handcuffs if the plaintiff had told him that they were too tight. Id. at ¶¶34–35. He avers that he did not intend to harm the plaintiff when he secured him in handcuffs. Id. at ¶36.

### c. Brown County Jail

Later on July 29, 2021, the plaintiff was transferred from Waupun to the Brown County Jail for a court matter. Dkt. No. 64 at ¶64. Before the transfer, Nurse Ann York (not a defendant) completed a "Health Transfer Summary for Continuity of Care." Dkt. No. 65-4 at 68. Nurse York noted that the plaintiff did not have any behavioral or mental health disturbances. Id. She listed his history of asthma, his food allergies, his medical needs and that he was on a hunger strike. Id. The plaintiff returned to Waupun on August 4, 2021, and staff from the jail completed another Continuity of Care summary. Id. at 66. Jail staff did not note any behavioral or mental health disturbances or other health concerns. Id. Weinman avers that if the plaintiff had complained about pain or discomfort while at the jail, jail staff would have noted that in the transfer summary. Dkt. No. 65 at ¶21.

### d. Berres's Assessment on August 17, 2021

Berres avers that she had limited involvement with the plaintiff after his July 29, 2021 fall, and that she was not assigned to his care. Dkt. No. 67 at ¶22. On August 17, 2021, Berres attempted to assess the plaintiff at his cell because he was on a hunger strike. Id. at ¶23. This was the first time she had seen the plaintiff since July 29, 2021. Id. The plaintiff told Berres that he was on a hunger and water strike. Id. at ¶24. He allowed Berres only to take his weight and refused all other assessments, telling Berres to "'get a court order.'" Id. at ¶25; Dkt. No. 65-2 at 33. Berres says that the plaintiff did not tell her that he was having headaches or experiencing pain in his wrists or hands. Dkt. No. 67 at ¶26. She avers that if he had told her about those things, she would have noted them in his care plans. Id.; Dkt. No. 65-2 at 34.

Berres avers that sometime on or before August 17, 2021, the plaintiff stopped her while she was passing out medication on his unit range. Dkt. No. 67 at ¶27. He told her that he had a headache and pain in his wrists and hands, and that he wanted pain medication. Id. Berres told the plaintiff that if he wanted medication, she would need to perform an assessment and report her findings to a provider, who could prescribe medication. Id. at ¶28. The plaintiff refused an assessment, so Berres ended the interaction. Id. Berres says that incarcerated persons with medical concerns must submit a request for health services to the HSU to be seen. Id. She says that as a nurse, she was not authorized to prescribe medication; only physicians can prescribe medication. Id. at ¶29. Berres did not have any further interaction with the plaintiff after August 17, 2021, and she was not again involved in his care. Id. at ¶30.

e.    The Plaintiff's Requests for Health Services[2]

One of Weinman's responsibilities as Health Services Manager was reviewing, addressing and responding to patient complaints or requests for health services. Dkt. No. 64 at ¶78. A patient can submit either a Health Service Request (HSR) or an Interview/Information Request (IIR) form to ask HSU staff to see him for a medical issue. Id. at ¶81. The HSU Manager does not review every request; a triaging nurse reviews the forms and uses her

---

[2] The defendants discuss the plaintiff's requests for health services from August through December 2021. The plaintiff signed his complaint on November 1, 2021, and the court received it the same day. Dkt. No. 1 at 8. As the court explained above, the plaintiff was allowed to proceed on claims related to his fall on July 29, 2021 and his assessment with Berres on August 17, 2021. Dkt. No. 20. His requests for health services after these dates are not relevant to the claims on which he is proceeding in this case. The court will only briefly summarize the requests he filed weeks after the court received his complaint.

discretion to decide which to forward to the HSU Manager for review. Id. at ¶82. The same is true even if a patient directs his request to the HSU Manager. Id. at ¶83. If a triaging nurse checks the "HSM" box on a health service request, that means the triaging nurse forwarded the request to the HSU Manager for review. Id. at ¶85.

On August 8, 2021, the plaintiff submitted two duplicate IIRs, one addressed to Weinman and one to Jeanpierre, in which he complained that no one had brought him a cup in which to urinate. Dkt. No. 65-2 at 14–17. He also complained about not being sent to the hospital after his July 29, 2021 fall. Id. The plaintiff did not request medical treatment for his head, hands or wrists, and he did not note any issues with them. Id. Weinman responded by recounting that the plaintiff was observed eating and drinking and asking if he had resumed his hunger strike. Id. at 14. Jeanpierre did not respond to the request addressed to her, but Weinman stated that it was a duplicate request. Id. at 17.

On August 17, 2021, the plaintiff sent an IIR addressed to Weinman in which he complained that he had told Berres that day that he was "havin[g] severe [illegible] pain [i]n [his] head from hit[ting] it on door on 7-29-21," but she would not prescribe him medication unless he allowed her to conduct an assessment of his hunger and water strike. Id. at 44. He also said that he was experiencing pain in his wrists and hands "due [to] handcuffs" that were "tight on [him]." Id. A non-defendant nurse forwarded this request to Weinman, who responded on August 23, 2021 that an assessment "is needed before RN can issue medications via protocol." Id. Weinman says that he meant by this that the plaintiff would need an assessment for his medication request, not an assessment of his hunger and water strike, to determine the plan of care

13

Case 2:21-cv-01263-PP    Filed 07/14/25    Page 13 of 73    Document 100

between him and his provider. Dkt. No. 65 at ¶36. Weinman echoes Berres's statement that nurses cannot prescribe medications, but he says that they can order medications using the nurse protocol, on which the medical director signs off. Id. at ¶37.

On August 17, 2021, the plaintiff wrote another IIR directed to Berres, in which he referenced the assessment with her earlier in the day and complained that she did not prescribe him pain medications for his headaches or the pain in his wrists and hands. Dkt. No. 65-2 at 36. He said that he told her about those issues that he believed stemmed from the July 29, 2021 incident. Id. The plaintiff also complained that Jeanpierre did not send him to the hospital after his fall that day. Id. Jeanpierre responded the next day, stating that the plaintiff did not need an offsite visit because he was medically stable. Id. She also noted his hunger strike and instructed him to order medication "off canteen." Id. Jeanpierre avers that ibuprofen and Tylenol both are available from the canteen, and that they would have "relieved the pain in his hands and wrists." Dkt. No. 68 at ¶34. She says that she did not tell the plaintiff that in her response to his request "because patients know the process for obtaining Tylenol." Id.

On August 29, 2021, the plaintiff wrote an HSR directed to Jeanpierre in which he asked why she had not seen him for his "severe headache." Dkt. No. 65-3 at 22. He wrote that his Excedrin was not working, he still had pain in his hands and wrists from the "situation on 7-29-21" and he had "made [them all] aware" that he needed a CAT scan." Id. Jeanpierre responded two days later, stating that he had not previously mentioned his hand or wrist pain. Id. Jeanpierre avers that she did not recommend a wrist splint because the plaintiff was in the RHU and wrist splints are prohibited for persons

14

incarcerated in the RHU. Dkt. No. 68 at ¶37. She again says that the plaintiff could have requested Tylenol or ibuprofen, which would have relieved his pain. Id.

Jeanpierre explains that a CAT scan is used to detect evidence of a fracture or bleeding between the skull and brain, which, if untreated, can cause pressure on the brain and lead to death. Id. at ¶38. She says that a CAT scan is appropriate when a patient shows signs of altered mental state, confusion, slurred speech or unsteady gait. Id. at ¶39. She says that these symptoms manifest within twenty-four to seventy-two hours of a serious head injury. Id. at ¶41. Jeanpierre avers that she did not order a CAT scan for the plaintiff because he did not report or demonstrate any of these symptoms. Id. at ¶41. She says that if he had, correctional officers would have notified the HSU, and they never did. Id.

On September 16, 2021, Nurse Taplin (not a defendant) emailed Jeanpierre informing her that the plaintiff had told Taplin that his Excedrin was not working for the migraines he was experiencing. Dkt. No. 65-3 at 31. Jeanpierre says she does not recall reading this message. Dkt. No. 68 at ¶43. She avers that if she had, she would have recommended Tylenol or ibuprofen. Id. She reiterates that patients at Waupun know how to request those medications. Id.

On September 19, 2021, the plaintiff filed an HSR directed to Jeanpierre and Weinman in which he complained that a non-defendant nurse had weighed him and told him he was underweight. Dkt. No. 65-3 at 32. He then asked why he was not getting "assess[ed] from [his] pain when [he] pass[ed] out 7-29-21 hit n [*sic*] [his] head." Id. Weinman responded by stating that he did "not understand what [the plaintiff was] writing/asking for here." Id.

On October 3, 2021, the plaintiff filed an HSR directed to Jeanpierre and Weinman, complaining that he had not yet been seen or had a CAT scan for the head injury that he said he suffered on July 29, 2021. Dkt. No. 65-4 at 4. He also stated that he had "pain in [his] wrist–hands when handcuffs be[ing] on tight." Id. Weinman responded three days later, stating that a provider had not yet ordered a CAT scan "to the best of [his] knowledge." Id. Weinman asserts that it was up to the plaintiff's provider to order a CAT scan. Dkt. No. 65 at ¶40.

On October 5, 2021, the plaintiff directed IIRs to Jeanpierre and Weinman in which he complained that they had not prescribed him pain medication for his head injury or for his wrists and hands. Dkt. No. 65-4 at 14, 16. He reported that he had been taking ibuprofen and Excedrin, accused the HSU of lying and told Jeanpierre and Weinman that they were aware of but ignoring his complaints that the pills were not working and that he needed a CAT scan. Id. Weinman responded to one of the requests and advised the plaintiff to await a response from his provider. Id. at 16. Weinman maintains that because this was a duplicate request, it did not require further response. Dkt. No. 65 at ¶42. Weinman reiterates that he cannot write orders for medication and says that a nurse could order only medication that would be "less than what [the plaintiff] was already ordered." Id.

Jeanpierre responded to the plaintiff's other October 5, 2021 request and advised him to refer to her previous responses. Dkt. No. 65-4 at 14. She explains that she did not order a CAT scan because it had been several months since the plaintiff's July 29, 2021 fall and he had submitted multiple requests for care that were lengthy and detailed and "matched the way he wrote prior to his fall." Dkt. No. 68 at ¶46. Jeanpierre determined from those requests that

the plaintiff was stable and did not need a CAT scan. Id. She says that this was the first time since he'd ordered it on August 12, 2021 that the plaintiff had complained that his ibuprofen (rather than his Excedrin) was not working. Id. at ¶47 (citing Dkt. No. 65-2 at 29). She reiterates that the plaintiff could have ordered Tylenol to take as needed. Id. She opines that the pain in the plaintiff's hands and wrists "usually resolves on its own." Id. at ¶48. She did not believe an x-ray would show nerve damage, so she did not order one. Id.

Jeanpierre explains that she could have ordered an Electromyography (EMG) to determine the cause of the pain in the plaintiff's hands and wrists. Id. at ¶49. She declined to do so because the plaintiff did not report any symptoms of muscle or nerve pain, such as numbness, tingling, decreased sensation, muscle wasting or a loss of function of the hand. Id. at ¶¶51–52. He instead "was able to write multiple lengthy care requests," which "indicated to [her] that he had full function of his hands and wrists." Id. at ¶53. Jeanpierre says that a "patient with serious pain in his hands and wrists would not have been able to write as much and as often as [the plaintiff] did." Id. For this reason, she did not believe the plaintiff's hand and wrist pain was serious. Id.

On November 1, 2021, the plaintiff filed an HSR directed to Jeanpierre, a non-defendant nurse and Weinman. Dkt. No. 65-4 at 30. He complained that he still had not had "a cat scan on [his] head from when [he] hit [his] head on [the] door on 7-29-21." Id. He again complained that he was experiencing "severe headache" and "pain [in] wrist-hands" and said he also was having vision problems. Id. Jeanpierre responded to the HSR by recounting that the plaintiff was "neurologically intact esp [*sic*] 3 mo[nths] ago." Id. Jeanpierre explains that three months had passed since the plaintiff's fall, and he still showed no symptoms warranting a CAT scan (altered mental state, confusion,

slurred speech or unsteady gait). Dkt. No. 68 at ¶55. She reiterates that the plaintiff could have requested Tylenol for his headache. Id. at ¶56. Weinman avers that he did not see this HSR, and there is no mark on the form showing that it was forwarded to him. Dkt. No. 65 at ¶43; Dkt. No. 65-4 at 30.

In November and December 2021, the plaintiff continued to file requests complaining that he had not been properly seen in July 2021, requesting a CAT scan and refills of his Excedrin (despite complaining that it and ibuprofen were not working) and reiterating that he was experiencing vision issues. Dkt. No. 64 at ¶¶97–103; Dkt. No. 65-4 at 33–34, 42, 50, 53–55, 57, 59, 62–64. Jeanpierre responded to one of these requests by assessing the plaintiff at his cell front on November 18, 2021 for his complaints of a headache and pain in his wrists "from handcuffs being too tight." Dkt. No. 65-4 at 49. She "encouraged him to use" the Excedrin and ibuprofen he had for his pain and headaches. Id.; Dkt. No. 68 at ¶63. She avers that during the examination, the plaintiff used his hands without signs of weakness or muscle wasting. Dkt. No. 68 at ¶59. He also reported no problems in his daily activities, such as bathing, getting into and out of a chair and bed, using the toilet and eating. Id. at ¶¶59–60. Based on these observations, Jeanpierre concluded that the pain in the plaintiff's hands and wrists was not serious. Id. at ¶61. She avers that the plaintiff complained that no x-rays of his hands were taken, but she opines that there was no need for x-rays because the plaintiff showed no visible deformity suggesting a fracture or dislocation in his hands or wrists. Id. at ¶62.

Weinman avers that he responded to other requests from the plaintiff, recording when the plaintiff had seen a provider (such as Jeanpierre) and reiterating that a CAT scan had not been ordered. Dkt. No. 65 at ¶¶45, 47, 50. Weinman reiterates that he cannot write orders, cannot order treatment (such as

a CAT scan) and cannot prescribe medication. Id. Weinman deferred to the medical staff's determinations that the plaintiff did not need additional assessments or imaging tests like a CAT scan. Id. at ¶54.

In November and December 2021, the plaintiff requested refills of his Excedrin and ibuprofen. Dkt. No. Dkt. No. 65-4 at 57, 62, 64. Jeanpierre filled his requests for those medications but did not allow him to have extra Excedrin pills, stating "too much tylenol not safe." Id. at 62; Dkt. No. 68 at ¶¶65, 67–68. That the plaintiff requested refills of his medications suggested to Jeanpierre that they were helping to control his headaches and the pain in his hands and wrists. Dkt. No. 68 at ¶66. Jeanpierre avers that she did not believe that the plaintiff's headaches before and after his July 29, 2021 fall, or the pain in his hands and wrists, were serious or that they posed an excessive risk to his health or safety. Id. at ¶¶70–71.

3. *Video Exhibits*

The defendants submitted video exhibits of footage taken on July 29, 2021 from the hallway of the RHU (Exhibit 1002) and the strip cell area and control bubble for the strip cell (Exhibit 1003). Dkt. Nos. 66-1, 66-2. The defendants filed the videos separately with the court. Dkt. No. 70. The videos are low quality and do not have audio.

a. Hallway Video

This video is nearly twenty-six minutes long. Ex. 1002. The defendants do not cite any specific timestamp in the video, so the court is unsure what portion or portions of this video are relevant. Throughout the video, the time randomly pauses and skips forward, jumping several seconds or minutes. *E.g.*, id. at 0:37 (jumps from 10:03:59 to 10:04:25), 1:40 (10:05:59 to 10:08:33), 4:24 (10:16:33 to 10:17:13), 13:51 (10:30:26 to 10:32:04). This means that

19

several minutes of the events allegedly shown in this video appear to be missing.

The video begins at 10:03:06 a.m., according to a clock at the bottom of the video. Id. at 0:00. A few figures can be seen at the end of the hall, but they are far from the camera and the video quality is too poor to make out how many people are there or what they are doing. Id. What appears to be an orange light occasionally illuminates one person. *E.g.*, id. at 0:10, 0:23. Later in the video, a brighter, bluish light appears occasionally around or in front of the figures. *E.g.*, id. at 3:12, 4:11, 6:06, 8:14, 11:27. Other staff appear near the end of the hallway, further obscuring the people who may or may not be the subject of this video. Id. at 4:34, 14:25. Some staff members walk up and down the hallway, passing out medication or performing other tasks. Id. at 5:29–8:18, 9:13–9:37, 10:28–10:59, 12:55–13:03, 14:06–16:56.

After 18:08, during which time the clock in the video covers about twenty-five minutes (from 10:03:16 to 10:38:10), the figures at the end of the hallway walk away from the cell and out of camera view. This could be the plaintiff's cell, but as the court will discuss below, by this time the plaintiff had been taken into the strip cage area. See *infra*, Discussion of Exhibit 1003. The court suspects these figures may be maintenance workers, and the flickering lights may be tools the workers are using for repairs in the RHU, but that is speculation only.

At 18:52, the video lurches forward from 10:49:36 to 11:16:53—more than twenty-five minutes. An officer can be seen at the end of the hallway, but again the video quality is too poor to discern what he is doing. Id. at 18:52–19:15. He slowly walks down the hallway, and it becomes clear that he is passing out meals. Id. at 19:15–22:10. At 22:24, the video leaps froward from 11:21:24 to

11:39:14, nearly eighteen minutes. Staff again appear at the end of the hallway and walk toward the camera for the remainder of the video. Id. at 22:24–25:01.

b.    Strip Cell Area Video

The second video is nearly forty-four minutes long. Exhibit 1003. At the start of the video, the clock reads 10:05:15, about two minutes after the start of the first video. Id. at 0:00. The video jumps forward in time randomly, like the first video.

Staff or incarcerated persons walk in and out of frame for the first 5:30 minutes. At 10:14:14 on the video clock, staff wheel the plaintiff in a wheelchair into a strip cage cell and shut the door. Id. at 5:30–5:48. The plaintiff is slightly slumped over; he does not move or appear to speak to staff as they wheel him into the cell. Id. The officers wheel the plaintiff in straight and do not turn him to face the door and out into the area. Id. Staff then walk away from the cell and out of view of the camera. Id. at 5:48–5:58. For the next several minutes, staff and other incarcerated persons walk around the area in camera view, and a staff member occasionally looks into the plaintiff's cell or approaches it to speak with the plaintiff. Id. at 6:27–6:39, 18:21–18:47, 19:01–19:18.

At 22:30 (11:08:21 on the video's clock), an officer in a white shirt approaches the area near the plaintiff's strip cell. The court knows this is Rymarkiewicz because his declaration says that he approached the plaintiff's cell around this time to speak with the plaintiff. Dkt. No. 66 at ¶25. Rymarkiewicz asks another officer to open the plaintiff's cell so that Rymarkiewicz can "observe him face-to-face and have a dialogue with him." Id.; Exhibit 1003 at 22:55–23:00. The officer opens the strip cell door, and Rymarkiewicz wheels out the plaintiff, who is still sitting in a wheelchair and

facing into the cell. Exhibit 1003 at 23:00–23:13. Rymarkiewicz speaks with the plaintiff, who moves little if at all during the conversation. Id. at 23:13–24:00. Although there is no audio, Rymarkiewicz has averred that it was during this conversation that he allowed the plaintiff to remain in the strip cell because the plaintiff told Rymarkiewicz that it was cooler than his cell, where he was having difficulty breathing. Dkt. No. 66 at ¶26. After this conversation, Rymarkiewicz wheels the plaintiff back into the strip cell, and he and another officer close the door. Exhibit 1003 at 24:00–24:14. He again pushes the plaintiff straight in without turning him to face the door. Id. Rymarkiewicz briefly remains in the area and speaks with the incarcerated person in the adjoining strip cell before walking away. Id. at 24:14–24:19.

Over the next several minutes, officers (including Rymarkiewicz) speak with the incarcerated person in the strip cell next to the plaintiff's. Id. at 25:11–31:37. These officers do not appear to speak with the plaintiff or look into his cell. Id. An officer removes this other person from the strip cell and walks him down the hall. Id. at 31:37–31:47.

At 32:38 (11:18:48 on the video's clock), a different officer in a white shirt (not Rymarkiewicz) approaches the plaintiff's strip cell and speaks with him. The officer calls to Rymarkiewicz, who appears and comes to the plaintiff's strip cell. Id. at 32:38–33:00. The officers open the door, wheel the plaintiff out and speak with him for a few moments. Id. at 33:00–35:13. Rymarkiewicz gestures or points down the hall, perhaps suggesting to the plaintiff that the officers take him back to his cell. Id.at 33:39. Rymarkiewicz avers that he was checking to ensure that the plaintiff had no breathing difficulties. Dkt. No. 66 at ¶27. The officers finish speaking with the plaintiff and wheel him back into the strip cell. Id. at 35:13–35:25. They again wheel him in straight, facing into the cell.

Id. At 11:21:35 on the video's clock, they close the door to the strip cell and begin to walk away before returning to speak with the plaintiff briefly. Id. at 35:25–35:45. They then walk out of the strip-cage area. Id. at 35:45–35:55. Nothing of note occurs in the remaining eight minutes of the video.

4. *The Plaintiff's Materials*

a. The Plaintiff's Exhibits

The plaintiff attached 315 pages of exhibits to his declaration in opposition to the defendants' summary judgment motion. Dkt. No. 82-1. These exhibits are not in any discernible order, they are not consistently labeled and many are not legible. Some exhibits are labeled with numbers, others are labeled with letters. Some exhibits are not inherently relevant, such as documents from three of the plaintiff's other cases. Id. at 41–44, 313–14. The court will review only the exhibits that the plaintiff cites in his response materials. See Fed. R. Civ. P. 56(c)(3).

b. The Plaintiff's Version of Events from July 29, 2021

In his declaration, the plaintiff details his "verison [*sic*] of his truthful events of what happened on 7-29-21." Dkt. No. 82 at 19. He avers that on July 12, 2021, he wrote to the warden and Rymarkiewicz that he was beginning a hunger strike the next day. Id. at ¶80. On July 25, 2021, he wrote to the HSU that he also was going on a water strike. Id. at ¶81. He says that all four defendants knew that he was on a hunger and water strike. Id. at ¶82.[3] The plaintiff claims that he "was not put in a monitored cell to monitored [*sic*] [him] nor was [he] offered a [*sic*] oral electrolyte—Gatorade" while on hunger and water strike from July 13 to 29, 2021. Id. at ¶83.

---

[3] In several places, the plaintiff uses the same paragraph number more than once. In these instances, the paragraph numbers usually are consecutive and related to one another.

The plaintiff avers that on July 29, 2021, Officer Rendmeister passed the plaintiff's cell while distributing medication and asked the plaintiff if he wanted his medications. Id. at ¶82. The plaintiff says that he "looked up and nodded" and began to walk but "passed out" after "two to three steps" and hit his head on the door. Id. The plaintiff says that he "came to" in the nurse's station in the RHU "in severe pain from [his] head hitting the door." Id. at ¶84. He was in a wheelchair with restraints on his legs and hands. Id. He says he heard Rymarkiewicz "and numberious [*sic*] other staff laughing, horsing around." Id. at ¶85. He says that Jeanpierre said to him, "there he is. is you OK. i heard you had a hard fall [*sic*]." Id. The plaintiff says that he "groaned with [his] eyes closed saying [his] head hurt." Id. at ¶86. He avers that Jeanpierre asked "do this hurt. do that hurt. examining [his] head injuries. while poking [his] head [*sic*]." Id. He says that Berres also asked "do this hurt. do that hurt. laughing [*sic*]." Id. He says that Rymarkiewicz was "poking [his] head laughing as well which is why Rymarkiewicz turnt [*sic*] his body camera off to cover up the dirt they did that day." Id.

The plaintiff avers that Jeanpierre and Berres "tried to conduct a hunger strike assessment which was very painful to [him] due to [he] just hit [his] head on the door and everything around [him] was spinning." Id. at ¶87. He claims that he "was screaming in pain due to [his] head injury" while Jeanpierre and Berres attempting to conduct the assessment, which is why they "allege's [*sic*] [he] refused the hunger strike assessment." Id. The plaintiff reiterates that he "was in so much pain [he] couldn[']t move or talk like that due to [him] being dehydration [*sic*] and no food." Id. He avers that he was unaware that Weinman "was present in the nurses station . . . when [he] was being treated–abused." Id. at ¶95. He says that Jeanpierre asked other staff three times if they should

"send him to the hospital," but that Rymarkiewicz "said[] fuck it let's keep him here." Id. at ¶88. He says that he "was wheelchaired to the strip cell area where [he] was wheeledchaired [*sic*] in straight facing the wall and not turnt [*sic*] around." Id. at ¶89. The plaintiff asserts that he "asked Rymarkiewicz right there can he loosened [*sic*] the hand cuffs[,] their to [*sic*] tight." Id. at ¶90. He recounts that Rymarkiewicz responded, "unless your [*sic*] ready to return to your cell their [*sic*] staying on." Id. He says that Rymarkiewicz "never checked to see if they were to[o] tight nor needed to be adjusted." Id.

The plaintiff avers that "what seem[ed] like a half and [*sic*] hour later Rymarkiewicz checked upon [him] and [he] asked him can he loosened [*sic*] these handcuffs[] their to [*sic*] tight which Rymarkiewicz stated unless your [*sic*] ready to return to your cell their [*sic*] staying on." Id. at ¶91. The plaintiff says that he asked Rymarkiewicz if Rymarkiewicz's body camera was on "for legal purposes," but that Rymarkiewicz "stated no and for what reason[,] which [the plaintiff] stated so you can[']t lie and say [he] didn[']t tell you to loosened [*sic*] these handcuffs due to them being tight." Id. at ¶92. He says that Rymarkiewicz "walked off without a response." Id. The plaintiff says that while in the strip cell, he never mentioned anything to Rymarkiewicz about having difficulty breathing. Id. at ¶93. He claims that this "is a fabrication, that Rymarkiewicz made up." Id. The plaintiff says that he was "left in the strip cell for over two hours in tight hand cuffs in pain[] until [he] was taken to brown county Jail [*sic*]." Id. at ¶94. He says that he "never returned to [his] cell [a]s Rymarkiewicz alleged in his declaration." Id. The plaintiff says that he has "cuts on [his] wrist due to tight handcuffs which 'HSU' omits from [his] medical records." Id. at ¶172.

The plaintiff claims that Rymarkiewicz intentionally turned off his body camera during his interactions with the plaintiff on July 29, 2021. Id. at ¶123. He asserts that Rymarkiewicz "has a vendetta against [him]" because the plaintiff told Rymarkiewicz that he "will beat his ass in cuffs or freed from them[] and [he] will send him to the hospital." Id. at ¶125. The plaintiff also says that he has written complaints about Rymarkiewicz in the past. Id. He claims that Rymarkiewicz regularly uses tight handcuffs on the plaintiff so that the plaintiff will not be able to "get out of them" or will not "come out of them as [he has] been known to do." Id. at ¶¶124, 126–127.

The plaintiff says that other incarcerated persons "were present" when he fell and hit his head, and he cites statements from two other incarcerated persons. Id. at ¶168; Dkt. No. 82-1 at 63–72. Dexter Ewing submitted a declaration in which he recounts the plaintiff's statements about his hunger and water strike and his fall on July 29, 2021. Dkt. No. 82-1 at 63. Ewing says that he is "a prisoner at Waupun Correctional Institute [sic] residing in RHU restrictive housing unit B upper room 201 next to [the plaintiff] who is in B-202." Id. at 64. Ewing does not say that he personally saw the plaintiff fall or hit his head; instead, he recounts the plaintiff's description of what happened, including that the plaintiff "was left in a wheelchair for hours with tight handcuffs till [sic] he went to court. Id. at 63.

Anthony Keepers recounts that the plaintiff was on hunger and water strike. Id. at 66. He says that on July 29, 2021, the plaintiff "repeatedly told C.O.'s that he was dizzy and nauseous." Id. He says that the officers ignored the plaintiff, and that between 8:00 and 9:00 a.m., he "heard what sounded like [the plaintiff] fall heavily against the door." Id. He says that "[a]t that point [the plaintiff] stopped talking" and did not "respond to [him] and his neighbor

in cell 201 calling his name." Id. at 66–68. Keepers says that he and other incarcerated persons called out a medical emergency, and officers arrived at the plaintiff's cell and found him unconscious. Id. at 68. Keepers says that he later heard the plaintiff say, while he was in the strip cage cell, "that he needed to go to the hospital to get his head looked at after hitting it when he passed out from dehydration and not having ate for over 2 weeks." Id. He says that the plaintiff remained in the strip cage area for "four hours," and then officers "brought [the plaintiff] back to his cell." Id. Keepers says that the plaintiff repeatedly asked why he was not "sent to the hospital, seen by a Doctor, given an IV or x-ray." Id. He says that staff ignored the plaintiff's "questions and pleas for help." Id.

The plaintiff says that after his July 29, 2021 fall, he "was weak, could not move[,] speak well . . . was dehydrated . . . couldn[']t walk let alone talk on [his] own." Dkt. No. 82 at ¶148. He says that he was not refusing to open his eyes, but that his "eyes were fluttering because [he] was in a daze having had [*sic*] hit [his] head on the door knocking [him]self out." Id. He claims that Berres lied about his condition and omitted from her medical notes that he hit his head when he fell and that he had a bump on his head. Id. at ¶¶113–14. The plaintiff says that he filed an institutional complaint against Rymarkiewicz, Jeanpierre and Berres for this incident, "wrote to [his] loved ones who also filed a complaint" and even "ha[d] the sheriffs [*sic*] office called to filed [*sic*] charges" against them. Id. at ¶165.

### c. Plaintiff's Version of Events of August 17, 2021

The plaintiff avers that on August 17, 2021, he "went to see Berres for hunger strike assessment including a[n] 'hsu' form [he] filed to be seen for [his] head injury" from the July 29, 2021 fall. Id. at ¶96. He says that he had a

three-man escort at the time, meaning three officers had to escort him to the HSU. Id. at ¶97. He says that the officers' body cameras "were [a]ctive the whole time during while [he] was seeing [B]erres on 8-17-21 and preserved." Id. He cites a request he submitted to preserve the footage from the officers' body-worn cameras. Id. (citing 82-1 at 175). But he did not submit any video footage from this assessment, and no body-worn camera footage is in the record.

The plaintiff says that during this appointment, he asked Berres to "assess [his] head injury due to [him] hitting [his] head on the floor on 7-29-21[] and that [he was] having severe headaches–migraines and that excedrin–Ibuprofen weren[']t working[] and for her to prescribe [him] something." Id. at ¶99. He asserts that Berres told him that "unless [he] let [her] assess [his] hunger strike [she was] not doing anything." Id. at ¶100. The plaintiff believed that his head injury "was more serious" than his hunger strike, so he told Berres "to assess [his] head injury first, before the hunger strike assessment and then she can assess [his] hunger strike." Id. at ¶101. She refused and told the plaintiff that if he did not consent to the hunger strike assessment, they "were[] done here." Id. at ¶102. The plaintiff still refused, so "she stated were [sic] done here," and the plaintiff returned to his cell. Id. at ¶103.

The plaintiff says he wrote to Berres, Weinman and Jeanpierre about the August 17, 2021 appointment and told them about Berres "refusing to address [his] severe headaches, migraines, pain in hands–wrists due to tight handcuffs." Id. at ¶¶105, 162 (citing Dkt. No. 65-2 at 35–40). He reiterates that Berres lied when she said that the plaintiff did not mention those issues during the appointment. Id. at ¶163. The plaintiff also says that Berres lied in her interrogatories when she said that during the August 17, 2021 appointment he did not tell her about his head injury. Id. at ¶112 (citing Dkt. No. 82-1 at 2–3).

He says that Berres also fabricated her statement about the plaintiff stopping her during medication pass on August 17, 2021 to tell her about his headaches and pain in his wrists and hands. Id. at ¶122. He claims that the HSU fabricates his medical records. Id.

### d. Plaintiff's Other Statements

The remainder of the plaintiff's declaration covers a variety of topics. The court will briefly discuss some of them.

The plaintiff asserts that Jeanpierre committed perjury by lying about being the plaintiff's physician since 2018. Dkt. No. 82 at ¶3. He says that he was in the Milwaukee County Jail in 2018 and did not arrive at Waupun until November 2018. Id. at ¶¶5–9. He lists other physicians who treated him while he was at other institutions from April 2018 until November 2018 and while at Waupun from November 2018 through January 3, 2021, which is when he says Jeanpierre became his physician. Id. at ¶¶10–16. He says that Jeanpierre also lied about whether she recalled treating the plaintiff on July 29, 2021. Id. at ¶¶17–21. He asserts that she was present and treated him that day but would not have been able to see if he had cuts on his wrists because he was handcuffed behind his back. Id. at ¶¶22–23.

The plaintiff asserts that Rymarkiewicz lied in his declaration by omitting that the plaintiff hit his head when he fell on July 29, 2021. Id. at ¶¶24–25. He cites an incident report written by correctional officer Jeffrey Rendmeister that states, "Inmate had fell while getting out of bed and hit his head on the cell door and was not responding to staff." Dkt. No. 82-1 at 260. The plaintiff also asserts that Rymarkiewicz lied about the plaintiff saying he was having difficulty breathing when the two spoke in the strip cell area on July 29, 2021.

Dkt. No. 82 at ¶¶26–27. He emphasizes that Rymarkiewicz's body camera was not recording at that time. Id. at ¶27.

The plaintiff asserts that Berres lied in her report from her July 29, 2021 examination of the plaintiff, when she wrote that the plaintiff was alert during the assessment. Id. at ¶28. The plaintiff says that he was not alert because he had not been eating since July 13, 2021 and had not consumed water since July 26, 2021. Id. at ¶29. He again claims that the HSU fabricated his medical records and "has a history of doing" so. Id. He says that Berres further lied about telling the plaintiff to open his eyes, and he reiterates that he could not do so because of his hunger and water strike. Id. at ¶¶30–31. He says that Berres also omitted information about him hitting his head and lied about not seeing any bumps or abrasions on him during the July 29, 2021 assessment. Id. at ¶114. The plaintiff cites a declaration from incarcerated person Kurtis Jones in support of his claim that the HSU fabricated his medical records. Id. at ¶31; Dkt. No. 82-1 at 62. Jones avers that he has "an extensive history with HSU and their practice of minimizing injuries to keep inmates from incuring [sic] extra expenses i.e. a[m]bulance rides, Hospital bills, name branded medication, etc." Dkt. No. 82-1 at 62. Jones says that nurses often told him that his injuries "were 'superficial' but needed to be glued shut, butterfly steristripped and wrapped." Id. He says that nurses have "fabricated something [he has] said, omitted important details and minimized the details of injuries in [his] files." Id.

The plaintiff reiterates his claim that Waupun has a "history of downplaying inmate injuries, fabricating medical notes[,] omitting serious inmate injuries." Dkt. No. 82 at ¶¶33–34. He again cites Jones's declaration and the incident report from July 29, 2021. Id. He reiterates that the incident

report says that he hit his head and was knocked unconscious, but that his medical progress notes "omitted intentionally" certain information. Id. at ¶¶34–35 (citing Dkt. No. 65-1 at 5; Dkt. No. 82-1 at 62, 260).

The plaintiff complains that staff violated institutional policy by not wearing or turning on their body cameras on July 29, 2021. Id. at ¶¶36–37. He cites a Department of Adult Institutions (DAI) policy about body cameras, which says that staff "shall activate their body camera when . . . [r]esponding to an institution emergency, both inside and outside of RH." Dkt. No. 82-1 at 243. This policy also states that in limited circumstances, "staff are permitted to turn off their BWC [body-worn camera] without prior approval. Examples include, but are not limited to . . . Observing or supervising an inmate receiving medical treatment, unless under exigent circumstances." Id. at 244. The plaintiff says that Rymarkiewicz was wearing a body camera on July 29, 2021 but that it was inactive. Dkt. No. 82 at ¶¶38–39. The plaintiff complains that staff also violated DAI policy regarding hunger or water strikes. Id. at ¶¶40–44. He cites DAI policy 300.00.57, which governs "Hunger Strike—Inmate Refusal to Eat or Drink." Dkt. No. 82-1 at 235–42. He claims that Waupun staff are "not trained—nor equipped to give inmates an IV bag." Dkt. No. 82 at ¶45. He says that Waupun can only "get a court order to force fluids—force feed inmates." Id. He again cites DAI policy 300.00.57 in support of these assertions. Id.

The plaintiff asserts that Jeanpierre contradicted herself from a previous case regarding when an incarcerated person on hunger strike is supposed to receive a urination cup. Id. at ¶¶46–47 (citing Dkt. No. 82-1 at 3, 54). He says that he was not given an electrolyte drink or assessed by a nurse or Jeanpierre when he began his hunger and water strike on July 13, 2021, which he says

violates DAI policy. Id. at ¶¶48–51. He says that his condition should have been "classified as 'emergent'" because he went twenty-four hours without fluids and seventy-two hours without food. Id. at ¶52. He says that the HSU falsified his medical documents by saying that his condition was "'non-urgent'" and did not follow policy for an incarcerated person refusing to eat or drink. Id. at ¶¶53–54.

The plaintiff asserts that nurses at Waupun can prescribe medication without a provider's order. Id. at ¶58. In support, he cites his medical progress notes from an appointment on July 6, 2021, during which a non-defendant nurse issued him ibuprofen and muscle rub for back pain. Id. (citing Dkt. No. 82-1 at 185–86). The plaintiff says that he was prescribed Excedrin before July 29, 2021, and that HSU staff increased his dosage from two times daily to three times daily for his headaches. Id. at ¶59. In support he cites a progress note from a February 26, 2021 appointment, in which Berres assessed the plaintiff and recorded his request to increase his Excedrin to three times daily. Dkt. No. 82-1 at 188. Berres notes that she "updated provider with pt [patient] requests." Id. The plaintiff says that he was prescribed ibuprofen only for his back pain, not for his headaches or migraines. Dkt. No. 82 at ¶60.

The plaintiff says that on December 20, 2022, a new physician "diagnosed [his] headache as 'severity' [sic] class and in ranking." Id. at ¶61. He says that he again hit his head on a door on March 20, 2022 and that "Jeanpierre and Weinman were aware . . . and didn[']t do nothing about it." Id. at ¶62. He says that he now wears prescription glasses because of his fall on July 29, 2021, "which caused blurred vision." Id. at ¶63. In support, he cites a December 8, 2021 invoice for his glasses. Id.; Dkt. No. 82-1 at 201, 315.

The plaintiff returns to the issue of his medication and asserts that Jeanpierre knew as early as February 26, 2021 that his Excedrin was not working. Dkt. No. 82 at ¶65. He cites Berres's progress note in which she said that she would report to Jeanpierre his request to increase his dosage. Id. (citing Dkt. No. 82-1 at 188). He says that Jeanpierre "became aware" that his Excedrin was not working again on August 17, 2021, when he asked to be prescribed stronger medication. Id. at ¶67 (citing Dkt. No. 65-2 at 36). He also cites the message that Nurse Taplin sent to Jeanpierre on September 16, 2021, noting the plaintiff's complaint that his medication was not working. Id. at ¶66 (citing Dkt. No. 82-1 at 196). The plaintiff says that Taplin told Jeanpierre that the plaintiff had complained about both his Excedrin and his ibuprofen, but that Taplin's note says only, "Pt stated that his Excedrin is not working for his migraines." Dkt. No. 82-1 at 196. Taplin's note says nothing about ibuprofen. Id.

The plaintiff says that Weinman also became aware on August 17, 2021 that the plaintiff's Excedrin was not working because Weinman replied to the plaintiff's request about it. Dkt. No. 82 at ¶69. He alternatively suggests that Weinman became aware on October 5, 2021 because he responded to a request the plaintiff had sent about his medication by telling the plaintiff to await a response from his provider. Id. (citing Dkt. No. 65-4 at 16). The plaintiff then discusses the requests he sent to Jeanpierre on November 22, 2021 and December 5, 2021 about his medication not working for his headaches. Id. at ¶¶70–71 (citing Dkt. No. 65-4 at 53, 59). He says that Weinman also knew in 2022 that his medication was not working. Id. at ¶72. But the plaintiff asserts that he requested refills of these medications multiple times, so much so that sometimes the HSU refused to give him a refill. Id. at ¶¶73–75 (citing Dkt. No.

82-1 at 145–173). He says that Jeanpierre, Weinman and Berres knew about his complaints that his medications were not working but that "nothing was done to treat [his] severe headache's [*sic*], migraines." Id. at ¶77.

The plaintiff reiterates that Rymarkiewicz "refused to loosened [*sic*] the tight handscuff's [*sic*] on 7-29-21," and he says that Rymarkiewicz also "refused to loosened [*sic*] them again on 3-16-22," when he was seen in the HSU about pain in his hands and wrists. Id. at ¶79 (citing Dkt. No. 82-1 at 199–200). The page of progress notes that the plaintiff cites does not address an incident from March 16, 2022. Dkt. No. 82-1 at 199–200. The note from May 3, 2022 says that the plaintiff complained of "pain to his right wrist," but that he had a full range of motion and denied an assessment. Id. at 199.

The plaintiff says that Jeanpierre stated in her interrogatories that she did not recall various details, like him writing to her about his hunger and water strike or telling him about her previous work experience. Dkt. No. 82 at ¶¶108–10. But he emphasizes that Jeanpierre replied to his request forms about his strikes and told him this information on another response. Id. (citing Dkt. No. 82-1 at 5–6, 78, 85; Dkt. No. 65-2 at 36). He similarly alleges that Weinman stated in his interrogatories that he could not remember the plaintiff telling him about him hitting his head or other issues, but emphasizes that Weinman says in his declaration that he *does* recall the plaintiff telling him these things. Id. at ¶¶115–120.

The plaintiff contests Jeanpierre's statement that his ability to write lengthy HSU requests showed that his hand or wrist injury was not serious. Dkt. No. 82 at ¶140. He insists that "it only took under a minute" to write these requests. Id. He claims that there were days he could not write at all because of the pain in his wrists and hands, and that sometimes he had other

incarcerated persons write requests for him. Id. at ¶¶141–142. He also asserts that Jeanpierre lied about him ordering pain medications off the canteen, and that he filed an institutional complaint against her for that comment. Id. at ¶166.

## II. Discussion

### A. Summary Judgment Standards

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Neither argument nor speculation is enough to avoid summary judgment. See Ammerman v. Singleton, 817 F. App'x 265, 268 (7th Cir. 2020) (citing Herzog v. Graphic Packaging Int'l, Inc., 742 F.3d 802, 806 (7th Cir. 2014)). The plaintiff, as the non-moving party, "must come forward with enough *evidence* to place [his] 'version of events' beyond the level of mere 'speculation or conjecture.'" Osborn v. JAB Management Serv's, Inc., 126 F.4th 1250, 1258 (7th Cir. 2025) (quoting Estate of Biegert by Biegert v. Molitor, 968 F.3d 693, 701 (7th Cir. 2020)) (emphasis added).

B.    Eighth Amendment

    1.    *Inadequate Medical Care*

The plaintiff asserts that Berres and Jeanpierre provided him inadequate medical care on July 29 and August 17, 2021, as well as after each of those dates. The court analyzes a plaintiff's claim that prison staff were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id.

In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once.'" Karraker v. Peters, 65 F.3d 170 at *3 (7th Cir. 1995) (citing Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991)). But the Supreme Court also has held "that medical conditions far less critical than 'life-threatening' would be encompassed" by the term "serious medical need." Gutierrez v. Peters, 111 F.3d 1364, 1370 (7th Cir. 1997). Factors the court must consider in determining whether a plaintiff's medical need is sufficiently serious are whether his condition has been diagnosed by a physician as needing treatment, id. at 1373 (citing Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D.N.H. 1977)); whether failure to treat the

condition could result in further serious injury or unnecessary and wanton infliction of pain, id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992)); and whether the condition significantly affects the plaintiff's daily activities, id. (quoting McGuckin, 974 F.2d at 1059–60).

To satisfy the subjective component, the plaintiff must demonstrate that the defendants had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. This requires a showing of "'more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). In other words, the evidence must show the defendants' "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45).

In the context of deliberate indifference by a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

### 2. Deliberate Indifference

The court also allowed the plaintiff to proceed on a claim that Rymarkiewicz and Weinman were deliberately indifferent to his needs on July 29, 2021, and that Weinman was further deliberately indifferent to his needs after that date. The court analyzes this claim under the same Eighth Amendment standard explained above. See Estelle, 429 U.S. at 104. To defeat summary judgment on this claim, the plaintiff must present evidence showing that Rymarkiewicz and Weinman "realize[d] that a substantial risk of serious harm to [the plaintiff] exist[ed], but then disregard[ed] that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837).

It is not enough for the plaintiff to show that the defendants were negligent or grossly negligent to a substantial risk that he faced. See Farmer, 511 U.S. at 835–36; Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001). He must present sufficient evidence that would allow a jury to conclude that the defendants "acted or failed to act with a deliberate or reckless disregard of the plaintiff's constitutional rights." Brownlow v. Van Natta, 2 F. App'x 516, 518 (7th Cir. 2001) (citing Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000), and Starzenski v. City of Elkhart, 87 F.3d 872, 880 (7th Cir. 1996)).

### 3. Excessive Force

Finally, the plaintiff asserts that Rymarkiewicz used excessive force when he placed the plaintiff in tight handcuffs on July 29, 2021. The court also analyzes this claim under the Eighth Amendment, which protects a convicted incarcerated person from cruel and unusual punishments. See generally Wilson v. Seiter, 501 U.S. 294 (1991). "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v.

Albers, 475 U.S. 312, 319 (1986)). In the context of a claim of excessive force, the plaintiff must present evidence showing both that (1) "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation," and (2) "'the officials act[ed] with a sufficiently culpable state of mind.'" Hudson, 503 U.S. at 8 (quoting Wilson, 501 U.S. at 298, 303). The "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 6 (citing Whitley, 475 U.S. at 320–21). Alternatively, the plaintiff can satisfy his burden by showing "that officials used force with 'a knowing willingness that [harm] occur.'" Farmer, 511 U.S. at 836 (quoting Hudson, 503 U.S. at 7).

The court must consider several factors in determining whether a use of force was necessary or excessive. Hudson, 503 U.S. at 7. These factors include "the need for force, the amount of force used, the threat reasonably perceived by the officer, efforts made to temper the severity of the force, and the extent of the injury caused by the force." Lewis v. Downey, 581 F.3d 467, 477 (7th Cir. 2009) (citing Whitley, 475 U.S. at 321, and Fillmore v. Page, 358 F.3d 496, 504 (7th Cir. 2004)).

C.    Analysis

Again, the plaintiff is proceeding on three Eighth Amendment claims. First, the court allowed him to proceed on a claim that Berres and Jeanpierre provided inadequate medical assistance when he fell on July 29, 2021; during an assessment on August 17, 2021; and in the weeks afterwards. Second, it allowed him to proceed on a claim that Rymarkiewicz and Weinman were deliberately indifferent and left him unattended in the strip cell on July 29, 2021, and that Weinman was deliberately indifferent to his medical needs in the

39

days and weeks afterwards. Finally, the court allowed the plaintiff to proceed on a claim that Rymarkiewicz used excessive force by securing the plaintiff in overly tight handcuffs on July 29, 2021. The court will address each of these claims separately, based on the alleged time frame and the defendants involved.

The plaintiff repeatedly raises issues or allegations about events that occurred before his July 29, 2021 fall and after the court received his complaint on November 1, 2021. The plaintiff is not proceeding on a claim about whether the HSU mismanaged his hunger or water strike before the July 29, 2021 fall. Nor is the plaintiff proceeding on claims related to events that occurred after he filed his complaint, including a subsequent fall that he says he suffered on March 20, 2022 and alleged mistreatment of his injuries from that subsequent fall. (That incident is the subject of another of the plaintiff's lawsuits before another court in this district; on October 13, 2023, Magistrate Judge William E. Duffin granted summary judgment in favor of the defendants and dismiss that suit. See Case No. 22-cv-706-wed.) This case concerns only the plaintiff's claims regarding his treatment from July 29 through November 1, 2021. The court will not address his allegations or concerns about events that occurred before July 29, 2021 or after November 1, 2021.

1. *Claims from July 29, 2021*

The defendants assert that the evidence shows they are entitled to summary judgment on the plaintiff's Eighth Amendment claims about his fall and treatment on July 29, 2021. Dkt. No. 63 at 7–15. The defendants submitted two videos taken from the morning on July 29, 2021, videos that they say show the events alleged in the plaintiff's complaint. But as the court has explained, the quality of those videos is poor and there is no audio. The defendants provide no timestamps for the first video, which shows a hallway in the RHU,

and provide few timestamps for the second video, which shows the strip cage area and is nearly forty-five minutes long. The court will discuss what evidentiary value, if any, these videos have regarding each of the plaintiff's claims about July 29, 2021.

a. Inadequate Medical Treatment (Berres, Jeanpierre)

The defendants dispute whether the plaintiff's condition was serious. Dkt. No. 63 at 10. They also assert that, even if the plaintiff's condition was serious, neither Berres nor Jeanpierre was aware of that condition and disregarded it. Id. at 10–14.

Berres avers that the plaintiff was alert during his examination. She says that he responded to her questions and did not show any symptoms of a serious head injury, such as lethargy or confusion. The only physical symptom Berres observed was redness on his cheek where the plaintiff had hit the ground when he fell. The plaintiff had no bump or gash on his head, and he was not bleeding. She stated that the plaintiff's eyes were "fluttering," which she opined may have been to give the impression that he was unconscious or semi-conscious. Berres avers, and her medical notes from the exam reflect, that the plaintiff allowed Berres to obtain his temperature, respiratory rate and pulse, all of which were normal. His heart rate was slightly elevated, but Berres avers that that was to be expected given the situation. Berres avers that the plaintiff refused IV fluids suggested by Jeanpierre because of his water strike. Berres concluded that the plaintiff was not facing an excessive risk to his health or safety. She signed a form recounting that the plaintiff had refused care and ended the appointment.

Jeanpierre does not independently recall the examination and relies on Berres's medical notes for her conclusions. Based on her review of those notes,

she agrees with Berres's conclusion that the plaintiff was not suffering from a serious health condition on July 29, 2021. She agrees with Berres that signs of serious head injury could include altered mental state, confusion, slurred speech or unsteady gait. She says that those signs usually manifest within twenty-four to seventy-two hours. She does not believe that the plaintiff was suffering from a life-threatening condition because he was not showing any of those symptoms, so she concludes that she and Berres could not force him to accept medical care.

The plaintiff disputes the defendants' version of the events. He says that he could not refuse care because he was dizzy, dazed and confused. He says that he was slurring his words and could not stand. The plaintiff avers that his eyes were fluttering because he had only just regained consciousness and he was weak. He says that Berres lied about him not having a bump on his head and says that he had redness on his cheek and a bump on his head from falling. He says that Berres and Jeanpierre joked about his condition and did not even attempt to assess him. He asserted in his complaint that the defendants refused to perform a CAT scan or give him an ice bag for his head.

The plaintiff repeatedly claims that Berres and/or the HSU fabricated his medical records regarding Berres's assessment on July 29, 2021. The only evidence he provides in support of this claim is the statement from Kurtis Jones. Dkt. No. 82-1 at 62. Jones generally avers that the HSU has minimized Jones's injuries, "fabricated something [he had] said" or "omitted important details and minimized the details of injuries in [his] files." Id. But Jones does not mention any of the defendants in this case, assert that any of them fabricated his documents or say that any person fabricated the plaintiff's medical files. The plaintiff also submitted several pages of his medical records as evidence in

support of his claims, despite insisting that his records are fabricated.[4] The plaintiff cannot create a genuine dispute of fact by claiming—without evidentiary support—that his certified medical records are false. See Davis v. Gee, Case No. 14-cv-617-wmc, 2017 WL 2880869, at *5 (W.D. Wis. July 6, 2017) (citing Scott v. Harris, 550 U.S. 372 (2007); and Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008)) (explaining that allegations "based on little more than speculation . . . [are] insufficient to manufacture a genuine issue of fact at summary judgment.").

But putting aside the plaintiff's speculation about his fabricated medical records, his declaration is sufficient to create a genuine dispute of material fact whether he was suffering from a serious medical issue during the July 29, 2021 appointment. The defendants aver that symptoms such as lethargy, confusion, slurred speech and unsteady gait could suggest a serious head injury. Berres's notes from the examination say that the plaintiff had none of those symptoms. But the plaintiff avers that he showed *all* those symptoms and others that suggested he was suffering from a serious head injury. Jeanpierre says that the plaintiff had no symptoms but suggests that they would not manifest for twenty-four to seventy-two hours. If that is correct, then the absence of symptoms immediately after the plaintiff's fall should not have excluded the possibility that he had suffered a serious head injury. It is possible that those symptoms *would* appear and simply had not yet. The defendants also assert that the plaintiff showed no signs of a serious injury when he returned from the Brown County Jail on August 4, 2021. But that report from days later is irrelevant to determining whether on July 29, 2021, only minutes after the plaintiff's fall, he showed signs of a serious head injury.

---

[4] See Dkt. No. 82-1 at 133–34, 145, 147–59, 161–73, 185–200.

This disputed evidence could allow a jury to find that the plaintiff showed symptoms suggesting that he faced a substantial risk of serious harm from a head injury at the time of his examination on July 29, 2021.

There also is a genuine dispute whether Berres and Jeanpierre sufficiently assessed the risk that the plaintiff had a potential severe head injury on July 29, 2021. Berres says the plaintiff refused multiple assessments and had no signs of a serious injury, so she did not believe he needed further treatment. Jeanpierre does not recall the examination but agrees with Berres's assessment based on Berres's notes. The plaintiff avers that he did not (and could not) refuse care. He avers that he was in too much pain to move or talk, but that Jeanpierre "shove[d] the stick in [his] mouth to get [his] temperature and blood pressure." Dkt. No. 82 at ¶87. He says that he "was screaming in pain" during these tests, which Berres and Jeanpierre ended abruptly. Id. He alleges that the defendants were taunting him, joking and poking him in the head during this examination. He says that Jeanpierre repeatedly asked other medical staff what they should do with the plaintiff before deciding to put him in the strip cage area.

The court observed in the screening order that the defendants would not be deliberately indifferent to the plaintiff's medical condition if they "did not perform certain tests or send the plaintiff to a hospital." Dkt. No. 20 at 7 (citing Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010); and Estelle, 429 U.S. at 106). That is because a "mere disagreement with a doctor's medical judgment" is not enough to show the doctor was deliberately indifferent "in violation of the Eighth Amendment." Berry, 604 F.3d at 441. But the plaintiff's declaration suggests that the defendants did less. He says that the defendants antagonized and teased him about fainting in his cell, refused to treat him and disregarded

the potential injury he had suffered. If that version of events is true, it is enough to suggest the defendants violated the plaintiffs' Eight Amendment rights.

The competing evidence could allow the jury to reach one of two conclusions—that the plaintiff refused care and showed no symptoms of a severe head injury, allowing the defendants to release him from their care, or that the defendants hastily assessed his symptoms, summarily determined that he did not require care and ended the examination. It is not the court's role to decide which of the competing versions of the facts is the correct one or which of the parties is more credible. Those decisions are for a jury to make. See Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704–05 (7th Cir. 2011) ("[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." (quotation marks and internal citations omitted)). The court will deny summary judgment for Berres and Jeanpierre on the plaintiff's Eighth Amendment claim regarding the care he received on July 29, 2021.

This claim relates only to the plaintiff's allegations that Berres and Jeanpierre provided him inadequate medical treatment. The plaintiff also alleges that Berres, Jeanpierre and Rymarkiewicz were joking, laughing and poking him in the head when he regained consciousness on July 29, 2021. But except in exceptional circumstances, unprofessional comments from prison officials do not constitute a violation of the Eight Amendment. See Lisle v. Welborn, 933 F.3d 705, 719 (7th Cir. 2019) (citing Beal v. Foster, 803 F.3d 356, 357–58 (7th Cir. 2015) (explaining that prison staff's use of even "[r]epugnant words . . . will seldom rise to an Eighth Amendment violation" because "[r]elationships between prisoners and prison staff are not always marked by genteel language and good manners"). The circumstances the plaintiff describes are not

exceptional and show, at most, unprofessional comments or behavior by prison officials. The comments may be relevant to the plaintiff's claim that Berres and Jeanpierre provided inadequate medical treatment, but they do not constitute a separate Eighth Amendment violation.

           b.     Deliberate Indifference (Rymarkiewicz, Weinman)

The evidence would not allow a reasonable jury to conclude that Rymarkiewicz was deliberately indifferent to the risk the plaintiff faced on July 29, 2021. The court explained in the screening order that Rymarkiewicz cannot be responsible for the plaintiff's medical treatment on July 29, 2021 because he is not a medical professional. Dkt. No. 20 at 8. The court allowed the plaintiff to proceed on a claim that Rymarkiewicz "had sufficient notice of 'an excessive risk to inmate health or safety' but failed to take any action to address that risk." Id. (quoting Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011); and citing Vance v. Peters, 97 F.3d 987, 993 (7th Cir. 1996)).

The evidence shows that that is not what occurred on July 29, 2021. It shows that Rymarkiewicz assisted in removing the plaintiff from his cell and bringing him to the nurse's station to treat him after his fall. After the plaintiff's examination, Rymarkiewicz took the plaintiff to a strip cell where the plaintiff would be constantly monitored for any signs of a medical or health emergency. The video evidence shows that, contrary to the plaintiff's allegations, Rymarkiewicz did not leave the plaintiff unattended for hours in the strip cage area. He checked on the plaintiff about an hour after placing him in the strip cell and again about ten minutes later. Both times, Rymarkiewicz wheeled the plaintiff out of the cell and spoke with him face-to-face. There is no audio on the videos, so the court cannot know what the parties discussed, but the video does confirm Rymarkiewicz's statement that he observed the plaintiff on

multiple occasions while the plaintiff was in the strip cell. The video evidence also confirms that other officers checked on the plaintiff while he was in the strip cell. Rymarkiewicz avers that even when no officer was physically in the strip-cage area, officers constantly surveilled this area from the nearby control bubble. The plaintiff did not submit any evidence contradicting Rymarkiewicz's statement or suggesting that he faced an excessive risk to his health while he was in the strip cage area.

There are two disputes regarding Rymarkiewicz's involvement on July 29, 2021. The plaintiff says that he never was returned to his cell on July 29, 2021. He says that he went from the strip cell immediately to the Brown County Jail. Rymarkiewicz avers that on July 29, 2021, the plaintiff was brought back to his cell before he was transferred to the jail. One of the plaintiff's witnesses (Anthony Keepers) also contradicts the plaintiff's statement and avers that prison staff brought the plaintiff back to his cell from the strip cell. Dkt. No. 82-1 at 68. The plaintiff also alleges in his complaint, and reiterates in his declaration, that Rymarkiewicz told medical staff that they should keep the plaintiff at Waupun rather than send him to a hospital. Rymarkiewicz denies saying this. These disputes are immaterial because the undisputed evidence, including the video footage, shows that Rymarkiewicz did not disregard the plaintiff's needs or leave him unattended in the strip cell. The evidence shows that Rymarkiewicz and other staff repeatedly checked on the plaintiff and spoke with him both in the cell and face-to-face outside the cell. No reasonable jury viewing this evidence could conclude that Rymarkiewicz was deliberately indifferent to an excessive risk to the plaintiff's health or safety on July 29, 2021.

The evidence also does not support a claim that Weinman was deliberately indifferent to a substantial risk of serious harm to the plaintiff on July 29, 2021. The evidence shows that Weinman was in the examination room as a "back-up" because of the plaintiff's history of assaulting staff. He did not assess or treat the plaintiff, and he did not see any sign that the plaintiff had a serious injury. Weinman is not a doctor, and the plaintiff did not name Weinman as one of the medical professionals who was in the nurse's station after his fall. He avers in his declaration that he was not even aware that Weinman was present. He does not assert that Weinman failed to take appropriate action during the examination or taunted him like the other defendants.

Nor is there evidence that Weinman had any contact with the plaintiff after security took the plaintiff to the strip cell or that the plaintiff contacted or attempted to contact Weinman from the strip cell. The plaintiff does not allege that he had any contact whatsoever with Weinman on July 29, 2021, and there is no evidence that he made Weinman aware that he needed additional or different care. No reasonable jury could find that Weinman was aware of but disregarded a substantial risk of serious harm to the plaintiff on July 29, 2021, either during his examination or afterwards when he was in the strip cell. Weinman is entitled to summary judgment on this claim.

c.     Excessive Force (Handcuffs)

The defendants contend that there is no evidence that the plaintiff's handcuffs caused him sufficient harm to satisfy the objective component of an Eighth Amendment claim. Dkt. No. 63 at 4. They emphasize that Jeanpierre's assessment of the plaintiff months later, on November 18, 2021, showed that he had no difficulty with daily activities, with which he would have struggled if he

48

had had long-term pain in his hands and wrists. Id. at 5. They also maintain that the plaintiff was able to write numerous requests for health services, which they say suggests that he was not suffering from severe bilateral wrist pain. Id.

The plaintiff's medical records provide some evidence to support his claim that the handcuffs Rymarkiewicz used on July 29, 2021 caused him long-lasting and severe pain. Those records show that the plaintiff first complained about hand or wrist pain from the handcuffs in an August 17, 2021 HSU request. Dkt. No. 65-2 at 44. He again complained about wrist or hand pain in HSU requests in October and November 2021. Dkt. No. 65-4 at 4, 16, 30. Jeanpierre noted his complaint about his wrists and hands in a progress note on November 18, 2021. Dkt. No. 65-1 at 50. The plaintiff then complained about "wrist and hand pain" in an HSU request he sent after a nursing appointment on November 22, 2021. Dkt. No. 65-4 at 31.

The plaintiff asserts that the HSU intentionally omitted other complaints he had sent about his hands and wrists or fabricated his medical notes. He says that the HSU also omitted from his medical records that he had cuts on his wrists from the handcuffs on July 29, 2021. These speculative statements cannot create a genuine dispute of fact for the reasons the court explained above. See Davis, 2017 WL 2880869, at *5; Springer, 518 F.3d at 484. The plaintiff also contests the defendants' assertion about his HSU requests. He says that he could write for only a minute or so at a time and that he sometimes asked another incarcerated person to write a request for him. But all the plaintiff's HSU requests in the record appear to be in his same handwriting. That shows that he, and not another incarcerated person, personally wrote his dozens of requests, often several in a single day. This belies his suggestion that he was in too much pain to write to the HSU.

Even if the court assumes for purposes of this decision that the handcuffs caused sufficient harm to satisfy the objective component of the deliberate indifference framework, the evidence would not allow a reasonable jury to find that Rymarkiewicz intentionally affixed the handcuffs overly tightly in a malicious or sadistic manner to cause harm. See Hudson, 503 U.S. at 6. The court explained in the screening order that "correctional officers may use handcuffs to restrain an incarcerated person who poses a threat of flight or injury." Dkt. No. 20 at 11 (citing Ajala v. Tom, 658 F. App'x 805, 806–07 (7th Cir. 2016); and Hope v. Pelzer, 536 U.S. 730, 737–38 (2002)). But "they may not do so to inflict *unnecessary* pain or injury." Id. (emphasis added); see Stainback v. Dixon, 569 F.3d 767, 772 (7th Cir. 2009).

Rymarkiewicz avers that he did not secure the handcuffs too tightly, and he does not recall the plaintiff telling him that they were too tight. He says that he did not intend to hurt the plaintiff when he secured him in handcuffs, and that he would have checked the cuffs if the plaintiff had complained about how tight they were. The plaintiff says that he told Rymarkiewicz that the handcuffs were tight when Rymarkiewicz first took him to the strip cell and again when Rymarkiewicz later checked on him. He says that Rymarkiewicz refused to remove the handcuffs unless the plaintiff agreed to return to his cell in the RHU. The video evidence of the strip-cage area shows Rymarkiewicz and the plaintiff talking on at least two occasions. But there is no audio, so the court cannot determine whether the plaintiff mentioned his handcuffs in these conversations. This evidence could allow a jury to find that Rymarkiewicz was aware that the plaintiff *believed* his handcuffs were too tight, but it does not allow the conclusion that Rymarkiewicz *intended* to harm the plaintiff when he secured the handcuffs or left them on.

The evidence shows that Rymarkiewicz secured handcuffs on the plaintiff given his status in the RHU, his history of assaulting staff and the circumstances around Rymarkiewicz removing the plaintiff from his cell. He avers that he secured the plaintiff in handcuffs as he would any incarcerated person who was being escorted from his cell. He says that he fastened the handcuffs appropriately based on his training and explains that the handcuffs "must be tightened to a degree to be effective." Dkt. No. 66 at ¶34. That Rymarkiewicz knew about the plaintiff's history of assaulting staff provided further justification for keeping the plaintiff handcuffed while he was out and away from his cell.

The plaintiff concedes that he has escaped handcuffs in the past and assaulted staff when he did so. He claims that Rymarkiewicz has a "vendetta" against him and uses tight handcuffs on him because he has threatened Rymarkiewicz, and that Rymarkiewicz once told the plaintiff after July 29, 2021, that he uses tight handcuffs to ensure that the plaintiff will not "come out of them as [he has] been known to do." Dkt. No. 82 at ¶127. The plaintiff's speculation about a "vendetta" does not create a genuine dispute of fact about Rymarkiewicz's reason for using tight handcuffs. See Cambronero v. Meli, Case No. 22-2103, 2023 WL 4946724, at *2 (7th Cir. Aug. 3, 2023) (citing Pulera v. Sarzant, 966 F.3d 540, 550–51 (7th Cir. 2020)); see also Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 602.

But more important, the plaintiff does not allege that Rymarkiewicz used tight handcuffs to hurt him, cause him pain or injure him or that he ever told the plaintiff that he does. There is no evidence supporting that that was the reason Rymarkiewicz used handcuffs. The plaintiff says that Rymarkiewicz told him Rymarkiewicz uses tight handcuffs "due to [the plaintiff] in the pas[t]

coming out of [his] restraints in 'RHU' at [W]aupun"; "so [he] can[']t get out of them"; because the plaintiff has "a violate [*sic*] history of assulting [*sic*] staff"; to ensure that the plaintiff "can[']t come out of them as [he has] been known to do"; because the plaintiff "was a threat on 7-29-21"; because the plaintiff previously came "out of [his] restraints slipping handcuffs"; and "so [the plaintiff] can[']t slip–come out of them." Dkt. No. 82 at ¶¶124, 126–127, 129–130, 139. These statements about Rymarkiewicz's alleged reasons for using tight handcuffs support Rymarkiewicz's explanation that he secured the plaintiff in handcuffs tightly enough to ensure that they would be effective, particularly because the plaintiff is known to be dangerous and has assaulted staff in the past. This justification for using tight handcuffs is not the same as using tight handcuffs to hurt or harm the wearer. It shows that Rymarkiewicz perceived a need to maintain discipline and protect others, not a wanton desire to harm the plaintiff.

The evidence shows that Rymarkiewicz used tight handcuffs to ensure that they would work properly, keep the plaintiff from getting out of them and protect staff during and after the plaintiff's examination. The evidence would not allow a reasonable jury to conclude that Rymarkiewicz placed the plaintiff in overly tight handcuffs for the purpose of causing him unnecessary harm or inflicting pain or injury. Rymarkiewicz is entitled to summary judgment on the plaintiff's Eighth Amendment claims against him.

2. *Claims from August 17, 2021*

a. Inadequate Medical Care (Berres, Jeanpierre)

The plaintiff claims that he had an appointment with Berres on August 17, 2021, during which he complained about lingering symptoms from his fall. He says that Berres refused to give him medication or provide further treatment unless he consented to an assessment of his ongoing hunger and water strike,

52

which he refused. The court explained in the screening order that it may have been permissible for Berres to "condition[] treatment for his pain on the plaintiff allowing her to address his hunger strike and water strike." Dkt. No. 20 at 7 (citing Eagan v. Dempsey, 987 F.3d 667, 692 (7th Cir. 2021)).

Berres avers that she had very little involvement in the plaintiff's care after July 29, 2021. She says that she saw him at his cell front on August 17, 2021 to assess his hunger and water strike. Berres avers that the plaintiff allowed her only to take his weight and refused all other tests. She says that he did not say anything about having headaches or pain in his wrists and hands during this assessment. Berres's medical notes show that this visit occurred at around noon. The plaintiff agrees that he saw Berres this day, but he says that three officers escorted him to the HSU to see her there at around 10:00 a.m. He says that the officers' body-worn cameras were recording, but there is no body-worn camera video in the record. The plaintiff says that he asked Berres to assess his head injury from the July 29, 2021 fall, and to prescribe him something for headaches he was suffering. He concurs that he refused to agree to a hunger-strike assessment. The plaintiff opines that his head injury "was more serious th[a]n a simple hunger basis strike assessment," and says he asked that Berres treat that concern first. Dkt. No. 82 at ¶101. He does not cite any evidence in support of that belief.

Berres also avers that the plaintiff stopped her earlier—on or before August 17, 2021—while she was passing out medication. She says that he mentioned a headache and pain in his wrists and hands and said he wanted pain medication. Berres says she was busy with medication pass, and she did not believe that the plaintiff was asking for immediate care. She advised him to consent to an assessment for pain medication so that she could report to his

provider what type of medication he may need. Berres says that the plaintiff refused the assessment, so she ended the interaction. She opines that the plaintiff knew that he could submit a request to the HSU if he believed he needed an examination or treatment. The plaintiff denies that this interaction occurred at all.

This evidence would not allow a reasonable jury to find that Berres was deliberately indifferent to the plaintiff's serious medical condition on or around August 17, 2021. There is no dispute that the plaintiff told Berres about his headaches and the pain in his wrists and hands, though the parties disagree about *when* he told her this. Berres says it occurred while she was conducting medication pass; the plaintiff says he told her during an appointment in the HSU. The specific day and place where the plaintiff told Berres about his pain is immaterial. What is material and undisputed is that Berres conditioned the plaintiff receiving pain medication on him submitting to an assessment, either of his hunger strike or a general assessment to determine what pain medication was appropriate. It also is undisputed that the plaintiff refused either assessment and demanded that Berres treat his headaches and pain before conducting any tests. This impasse ended the interaction or interactions between Berres and the plaintiff on or around August 17, 2021.

There is no evidence that Berres refused to provide the plaintiff pain medication "to teach him a lesson about the consequences of self-destructive behavior." Eagan, 987 F.3d at 692. The plaintiff has not asserted that this is why Berres refused to provide him pain medication, and he did not provide the court the body-worn camera footage that he says was taken from the officers who escorted him to the HSU for his appointment. His unverified insistence that Berres lied about their interactions is not evidence that can create a

genuine dispute of fact. See Davis, 2017 WL 2880869, at *5; Springer, 518 F.3d at 484. The only evidence that on August 17, 2021, the plaintiff's head injury was a more pressing issue than his hunger strike or general assessment (or assessments) is the plaintiff's statement that it was. Berres disagreed and advised the plaintiff to consent to an assessment. This evidence shows that Berres and the plaintiff disagreed about the proper course of treatment on or around August 17, 2021. As the court explained above, this disagreement does not amount to an Eighth Amendment violation. See Berry, 604 F.3d at 441; Estelle, 429 U.S. at 106. Berres is entitled to summary judgment on the plaintiff's Eighth Amendment claim regarding their interaction or interactions on or around August 17, 2021.

The plaintiff also claims that after July 29, 2021, Jeanpierre continued to provide inadequate medical care for his headaches and the pain in his wrists and hands. Jeanpierre avers that she responded to the plaintiff's August 17, 2021 request to Berres about their visit that day. He also asked why Jeanpierre did not send him to a hospital on July 29, 2021. Jeanpierre responded that the plaintiff "did not warrant offsite" and cited "27 yrs working in ER" as her justification for that conclusion. Dkt. No. 65-2 at 36. She also wrote, "hunger strike—you are ordering off canteen." Id. She says in her declaration that this meant that the plaintiff could order medication like Tylenol off the canteen to relieve the pain in his wrists and hands. She did not tell him that in her response, but she says that "patients know the process for obtaining Tylenol." Dkt. No. 68 at ¶35. Even so, without telling the plaintiff what he could or should do to relieve his pain, her brief response reads like indifference to his complaints of pain.

The evidence shows that the plaintiff sent numerous requests or complaints to Jeanpierre in August through November 2021, but that Jeanpierre responded to only a few of them. More often, a non-defendant nurse responded to the plaintiff, scheduled him for an appointment and on occasion noted that he or she would communicate the issue to his provider. On August 29, 2021, the plaintiff wrote an HSU request complaining that he had not yet been seen for his headaches, that his Excedrin was not working, that he had pain in his wrists and hands and he that needed a CAT scan. Dkt. No. 65-3 at 22. Jeanpierre responded two days later but wrote only, "No mention of hand pain or wrist pain." Id. She says in her declaration that this meant that the plaintiff had not previously mentioned hand or wrist pain in his requests to the HSU. But the plaintiff *had* mentioned this pain only two weeks earlier in his August 17, 2021 inquiry about his appointment with Berres, *to which Jeanpierre responded.* Dkt. No. 65-2 at 36. She says in her declaration that she did not recommend a wrist splint because the plaintiff was in the RHU, where they are not allowed. Dkt. No. 68 at ¶37. She also reiterates that the plaintiff could order alternate pain medication. Id. But again, she did not say any of these things in her response to the plaintiff's HSU request.

Jeanpierre points to a September 16, 2021 email from a nurse about the plaintiff's complaint that his Excedrin was not controlling his migraines. She says she does not recall reading this email, and there is no evidence that she responded to either the nurse or the plaintiff about it.

The plaintiff complained in October 2021 that Jeanpierre had not prescribed him pain medication and had lied about him not making her aware earlier that his pain medications were not working. Jeanpierre responded to this request by writing "see previous," referring to her previous responses to the

plaintiff. Dkt. No. 65-4 at 14. But as the court has observed, Jeanpierre did not often respond to the plaintiff's requests. Telling him to see previous responses assumed he had those responses from August or earlier. Jeanpierre's previous responses were similarly curt—for example, telling the plaintiff "hunger strike—you are ordering off canteen" in response to his August 17, 2021 complaint about his appointment with Berres. Dkt. No. 65-2 at 36. Jeanpierre avers in her declaration that the HSU provided the plaintiff ibuprofen on August 12, 2021 and that he did not complain about its effects. Dkt. No. 68 at ¶47 (citing Dkt. No. 65-2 at 29). She says that she believed that if the ibuprofen did not work, the plaintiff could request Tylenol instead to keep in his cell. Id. But Jeanpierre said none of that in her response to the plaintiff and, as discussed above, told him only to refer to her previous (also short) responses. Jeanpierre says that she also considered other tests, such as an x-ray or EMG, but did not order them given the plaintiff's reported symptoms. But again, she does not appear to have told the plaintiff any of that, nor did she record it in his medical file. She appears to have told him little to nothing about his condition or what treatment might or might not be warranted given his complaints. It is understandable that the plaintiff repeatedly complained about his treatment when his providing physician offered little feedback.

Jeanpierre next responded to the plaintiff's November 1, 2021 HSU request for a CAT scan. She wrote, "you are neurologically intact esp 3 mo ago." Dkt. No. 65-4 at 30. She explains in her declaration what she meant by this—that three months had passed since the plaintiff's fall and he had showed no symptoms suggesting a head injury, so a CAT scan was unwarranted. Again, Jeanpierre did not say any of that in her response to the plaintiff or record in his medical files what she meant. Without the explanation provided in her

declaration, Jeanpierre's eight-word response is confusing and cryptic. She also reiterates in her declaration that the plaintiff could request Tylenol for his headaches, but she did not tell him that in her response.

Jeanpierre saw the plaintiff at his cell door on November 18, 2021. As far as the court can tell, this is the first time she had assessed the plaintiff since his July 29, 2021 fall nearly four months earlier. The plaintiff complained about wrist pain, but Jeanpierre determined that he was able to use his wrists without issue during the appointment and based on his self-report about his daily activities. She denied the plaintiff's suggestion for x-rays of his wrists because they were warranted only for deformities, which the plaintiff did not show. She says that the plaintiff also complained about headaches, and that she encouraged him to use his already prescribed medications for that pain.

The evidence shows that a nurse saw the plaintiff four days later, on November 22, 2021, and that he complained about the same issues. Dkt. No. 65-4 at 47. He then wrote to the HSU about this appointment, reiterated his concerns and contested Jeanpierre's conclusion that he did not need a CAT scan. Id. at 53. Jeanpierre responded to this request, "Noted." Id. (all caps omitted). Later in November 2021, Jeanpierre refilled the plaintiff's Excedrin per his request. She says that she believed that this showed that the Excedrin was helping to control the plaintiff's pain, despite his previous complaints that it was not. She denied the plaintiff's December 2021 request for extra Excedrin pills, stating "too much tylenol not safe." Id. at 62. The plaintiff says that this shows that Excedrin and Tylenol are effectively the same medication and that Jeanpierre disregarded his complaints about his Excedrin not working by telling him to purchase Tylenol from the canteen.

As the court explained above, Jeanpierre was not deliberately indifferent solely because she did not order a CAT scan or send the plaintiff to a hospital on July 29, 2021 (though she may have been deliberately indifferent for other reasons the court discusses above). See Berry, 604 F.3d at 441; and Estelle, 429 U.S. at 106). The same applies to the treatment she provided after the plaintiff's fall on August 17, 2021 and after that date. It also applies to her decisions not to order an x-ray or EMG for the plaintiff. Jeanpierre explains that the plaintiff did not show or report symptoms for which an x-ray or EMG likely would reveal any useful information. These reasoned decisions do not constitute deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

But there is a material, factual dispute about whether the plaintiff's complaints of headaches, migraines, pain and his ineffective medication amounted to an objectively serious medical condition and whether Jeanpierre disregarded those complaints. Jeanpierre does not dispute that as early as August 17, 2021, she knew about the plaintiff's complaints that his ibuprofen and Excedrin were not working to control his headaches and pain in his wrists and hands (despite her August 31, 2021, response telling the plaintiff that he had not previously complained to the HSU about his wrist or hand pain). She says that the plaintiff could have ordered additional medication from the canteen to control his pain, including more ibuprofen and Tylenol, which Jeanpierre implies is the same thing as Excedrin. In their reply brief, the defendants say that because the plaintiff "could simply purchase Ibuprofen off his canteen or

use Tylenol as an 'as needed' medication . . . [his] headaches were not serious."
Dkt. No. 90 at 4–5.

The court does not understand Jeanpierre's argument. The plaintiff's allegations of severe and persistent pain are sufficient to constitute a serious medical need under the Eighth Amendment. See Walker v. Benjamin, 293 F.3d 1030, 1040 (7th Cir. 2002). The Seventh Circuit also has recognized that a prison official who "doggedly persist[s] in a course of treatment known to be ineffective" may violate the Eight Amendment. Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005). The plaintiff's repeated complaints about his pain and unhelpful medication, some of which Jeanpierre responded to, are evidence that Jeanpierre knew that the plaintiff was getting no relief from those medications but did not prescribe anything else, assess the plaintiff or otherwise address his concerns. Telling a patient to purchase a medication in response to his complaints that that medication is ineffective does not show that his condition is not serious. Jeanpierre's argument suggests that she disregarded the plaintiff's headaches and pain—and his concern that his medication was not addressing those issues—by telling him simply to purchase more of the same medication that he said was not working.

Jeanpierre says that because the plaintiff requested refills of Excedrin at the end of November 2021, she believed that his medication was working to control his pain. But this does not address the plaintiff's numerous complaints between August and November about the Excedrin and ibuprofen that he repeatedly said were not working to control his pain. Jeanpierre later warned the plaintiff against taking too much *Tylenol* when he asked to have additional *Excedrin* pills. That suggests that Jeanpierre believed that Excedrin and Tylenol are effectively the same medication. It also bolsters the plaintiff's assertion that

Jeanpierre refused to recommend alternate medication. Jeanpierre does not explain this discrepancy or provide any reason why she did not recommend alternate medication or examine the plaintiff in person to determine what medication might be appropriate. This is not like the plaintiff's claim against Berres for not prescribing him alternate medication. Berres told the plaintiff that she would first need to assess him before recommending new pain medication. The plaintiff refused the assessment, so Berres could not determine what medication might be appropriate. There is no evidence that Jeanpierre assessed or attempted to assess the plaintiff's pain. Had she done so, and had the plaintiff also refused her assessment, she could not be said to have been deliberately indifferent. Berres also does not have the authority to prescribe medication as a nurse, whereas Jeanpierre is a physician who can prescribe medication.

A reasonable jury viewing this evidence could determine that Jeanpierre disregarded the plaintiff's repeated complaints of severe headaches, migraines and pain in his hands and wrists from at least August 17 to November 18, 2021, when Jeanpierre saw the plaintiff at his cell. A reasonable jury could find that Jeanpierre was deliberately indifferent to the plaintiff's repeated reports of pain by providing him curt, unhelpful responses and directing him to order more of a medication despite his complaints that that medication was ineffective. Jenapierre is not entitled to summary judgment on this claim.

b.      Deliberate Indifference (Weinman)

The court allowed the plaintiff to proceed on a claim that Weinman "refused to respond to his HSU requests" when he "contacted Weinman about 'the situation.'" Dkt. No. 20 at 10 (quoting Dkt. No. 1 at 3). The court said in its screening order that it was a "close call" whether the plaintiff's allegations satisfied the subjective component of an Eighth Amendment claim. Id. The court

assumed for the purposes of screening that the plaintiff's allegations were true and allowed him to proceed on this claim but warned him that "to succeed on this claim, he will need to provide evidence that Weinman himself was aware of and disregarded the plaintiff's condition." Id. at 11.

The evidence shows that Weinman was aware of but did not disregard the plaintiff's complaints about his condition after July 29, 2021. Weinman avers that he does not respond to every request that incarcerated persons send to the HSU; a triaging nurse reviews an HSU request and decides whether the HSU manager (Weinman) needs to see it. Weinman responds only to requests that the triaging nurse refers to him. Weinman says that just because an incarcerated person directs a request to him, that does not mean he will receive or see it.

The evidence shows that Weinman reviewed some, but not all, of the plaintiff's requests about his head or hand and wrist conditions from July 29, 2021 through November 1, 2021. He generally told the plaintiff to refer his requests to his provider and to follow the advice of his nurses and physicians, including to agree to an assessment of his pain before medical staff would prescribe him appropriate medication. Weinman is not a doctor, so he could not prescribe medication. The plaintiff also frequently requested a CAT scan and asked why medical staff had not ordered one after his July 29, 2021 fall. Weinman explains that he could not order a CAT scan and that only a physician or other provider could. He told the plaintiff that no CAT scan had been scheduled because his provider (Jeanpierre) had determined that one was not medically necessary. The plaintiff continued to request a CAT scan into November 2021, but Weinman avers that he did not see these requests. Weinman continued to respond to those of the plaintiff's requests that he did

see, and he again reminded the plaintiff that he could not order tests or prescribe medication.

This evidence would not allow a reasonable jury to find that Weinman disregarded the plaintiff's complaints about his head, wrist and hand pain or his requests for a CAT scan. The undisputed evidence shows that Weinman could not prescribe medication or order a CAT scan, so he did not do those things. Instead he responded to the plaintiff's complaints and advised him to ask his provider for certain treatment and follow their guidance. The plaintiff contests Weinman's statements about his authority, but the plaintiff has no personal knowledge to support that dispute. His unsupported insistence that Weinman could have prescribed him medication or ordered a CAT scan does not create a genuine dispute of material fact sufficient to overcome summary judgment. See Cambronero, 2023 WL 4946724, at *2; Ammerman, 817 F. App'x at 268. And as the court discussed above, medical staff addressed the plaintiff's complaints and determined that a CAT scan was not medically required. Weinman was entitled to defer to the medical staff's treatment decisions. See Arnett, 658 F.3d at 755; Greeno, 414 F.3d at 656.

The evidence shows that the plaintiff disagreed with the treatment he received in response to his numerous requests, so he complained to Weinman. Weinman reviewed many of those complaints, responded to the extent he was able and deferred to medical staff's decisions about the plaintiff's treatment. The plaintiff has identified no evidence suggesting that Weinman was on notice of an excessive risk to the plaintiff's health but failed to address it in his role as HSU manager. The plaintiff's disagreement with Berres's and Jeanpierre's assessments of his condition are not sufficient to hold Weinman responsible for not ordering different treatment—which Weinman had no authority to do.

63

Case 2:21-cv-01263-PP    Filed 07/14/25    Page 63 of 73    Document 100

see, and he again reminded the plaintiff that he could not order tests or prescribe medication.

This evidence would not allow a reasonable jury to find that Weinman disregarded the plaintiff's complaints about his head, wrist and hand pain or his requests for a CAT scan. The undisputed evidence shows that Weinman could not prescribe medication or order a CAT scan, so he did not do those things. Instead he responded to the plaintiff's complaints and advised him to ask his provider for certain treatment and follow their guidance. The plaintiff contests Weinman's statements about his authority, but the plaintiff has no personal knowledge to support that dispute. His unsupported insistence that Weinman could have prescribed him medication or ordered a CAT scan does not create a genuine dispute of material fact sufficient to overcome summary judgment. See Cambronero, 2023 WL 4946724, at *2; Ammerman, 817 F. App'x at 268. And as the court discussed above, medical staff addressed the plaintiff's complaints and determined that a CAT scan was not medically required. Weinman was entitled to defer to the medical staff's treatment decisions. See Arnett, 658 F.3d at 755; Greeno, 414 F.3d at 656.

The evidence shows that the plaintiff disagreed with the treatment he received in response to his numerous requests, so he complained to Weinman. Weinman reviewed many of those complaints, responded to the extent he was able and deferred to medical staff's decisions about the plaintiff's treatment. The plaintiff has identified no evidence suggesting that Weinman was on notice of an excessive risk to the plaintiff's health but failed to address it in his role as HSU manager. The plaintiff's disagreement with Berres's and Jeanpierre's assessments of his condition are not sufficient to hold Weinman responsible for not ordering different treatment—which Weinman had no authority to do.

Case 2:21-cv-01263-PP    Filed 07/14/25    Page 63 of 73    Document 100

Weinman is entitled to summary judgment on the plaintiff's Eighth Amendment claims against him.

### 3. *The Plaintiff's Other Arguments*

The plaintiff raises several other issues in his declaration. Some concern irrelevant topics or non-existent evidence. The court will briefly address some of these other issues.

The plaintiff takes issue with inconsistencies between some of the defendants' answers in their interrogatories and the statements in their declarations. He says that some defendants claimed not to remember a request he filed, but that they responded to that request or cited it in their declaration. The events from this case occurred in July through November 2021. The defendants' responses to the plaintiff's interrogatories are dated October 19 and 20, 2022—about a year later. Dkt. No. 82-1 at 2, 10, 12, 20–21, 31–32, 40. Their declarations are dated months after that. Dkt. Nos. 65 at 11 (Weinman, Feb. 2, 2023), 66 at 6 (Rymarkiewicz, July 25, 2023), 67 at 6 (Berres, Jan. 27, 2023) and 68 at 12 (Jeanpierre, Feb. 9, 2023). It is possible, even likely, that the defendants had not yet viewed all the evidence when they answered the plaintiff's interrogatories, so they did not recall all the details from his July 29, 2021 fall—which had occurred over a year earlier. It follows that the defendants would have a better recollection of those events after viewing the papers showing their role in the plaintiff's care that day and on August 17, 2021. The differences in their statements, taken months apart, do not suggest that they lied in their discovery responses or their declarations.

The plaintiff claims that Waupun staff are unqualified to provide IV fluid bags for patients. He similarly asserts that nurses, like Berres, can prescribe medications. But the plaintiff is not a medical professional, has no medical

training and is not qualified to give an opinion on these topics. See Fed. R. Evid. 701, 702. The plaintiff cites his medical notes in support of his assertions, including a time when a non-defendant nurse issued him ibuprofen for back pain. Dkt. No. 82-1 at 185–86. Jeanpierre explains that certain medications, including ibuprofen and Tylenol, are available for purchase from the canteen. Dkt. No. 68 at ¶34. Berres avers that only providers can prescribe medications not available through the canteen. Dkt. No. 67 at ¶29. For example, the plaintiff's medical records show that Berres had to go through the plaintiff's provider to approve his requested increase of Excedrin. Dkt. No. 82-1 at 188. Weinman echoes Berres's statement but explains that nurses can order (not prescribe) some medications, subject to the approval of the medical director. Dkt. No. 65 at ¶37. The evidence does not suggest that Berres could have prescribed the plaintiff additional medication on her own but refused to do so.

The plaintiff says that Rymarkiewicz intentionally turned off, or failed to turn on, his body camera on July 29, 2021 in violation of DAI policy. He similarly says that Weinman, Jeanpierre and Berres violated DAI policy regarding how to handle an incarcerated person on a hunger or water strike. The court explained in the screening order that the plaintiff's allegations "that defendants failed to follow DAI Policy does not state [a] claim for relief under §1983." Dkt. No. 20 (citing Estate of Simpson v. Gorbett, 863 F.3d 740, 746 (7th Cir. 2017); and Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003)). The court also notes that the policy that the plaintiff cites regarding body-worn cameras gives staff the discretion to turn off their camera "without prior approval" if they are observing an incarcerated person "receiving medical treatment." Dkt. No. 82-1 244. Rymarkiewicz was observing the plaintiff receiving medical treatment on July 29, 2021. He may not have been observing medical treatment later that

morning when the plaintiff was in the strip cell. But as the court has explained, that does not mean he violated the plaintiff's constitutional rights by not following DAI policy and turning on his body-worn camera during those interactions. And finally, the court has explained that this lawsuit is not about how the defendants handled the plaintiff's hunger/water strikes. The plaintiff's assertions about DAI policies do not amount to an Eighth Amendment violation and are not a claim on which he is proceeding.

D.    Qualified Immunity[5]

The defendants assert that even if the court determines there is a genuine dispute of fact on the plaintiff's Eighth Amendment claims, they are entitled to qualified immunity. Dkt. No. 16 at 16–20. They contend that there is "no existing precedent" allowing the plaintiff to hold Berres and Jeanpierre "liable for medical deliberate indifference where they allegedly did not provide him any care, although [the plaintiff] is the one who refused care and then asked for unwarranted treatment." Id. at 16. They frame the plaintiff's claims against Berres and Jeanpierre as only "a 'disagreement between a prisoner and his doctor,'" which they say "'is insufficient, by itself, to establish an Eighth Amendment violation.'" Id. at 19–20 (quoting Pyles, 771 F.3d at 409). The plaintiff disagrees that the defendants are entitled to qualified immunity. Dkt. No. 79 at 27–30. He cites Greeno, 414 F.3d at 652, and Estelle, 429 U.S. at 104, for the proposition that at the time of his allegations, "his constitutional right to received [sic] adequate medical care were [sic] established." Id. at 28.

_____

[5] Because the court is granting summary judgment to defendants Weinman and Rymarkiewicz "'on the facts, [they] do[] not need qualified immunity.'" Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Figgs v. Dawson, 829 F.3d 895, 905 (7th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)). Qualified immunity is an affirmative defense. To defeat the defendants' assertion of qualified immunity, the plaintiff must show that 1) the defendants violated one of his constitutional rights and 2) the right at issue was clearly established at the time of the violation. Pearson, 555 U.S. at 232. If the plaintiff fails to satisfy either inquiry, then the defendants are entitled to qualified immunity. See Muhammad v. Pearson, 900 F.3d 898, 904 (7th Cir. 2018) (citing Gibbs v. Lomas, 755 F.3d 529, 537 (7th Cir. 2014)). For purposes of qualified immunity, the court views the evidence in the light most favorable to the plaintiff because he is the nonmoving party. See Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019).

The defendants fault the plaintiff for "simply restat[ing] the standard" for deliberate indifference in response to their assertion of qualified immunity. Dkt. No. 90 at 8. But as the court ha concluded, a reasonable jury could believe the plaintiff's version of events related to his medical treatment (or lack thereof) on July 29, 2021 and conclude that Berres and Jeanpierre provided him *no treatment* despite him falling and hitting his head. The court recognized in the screening order that these allegations "go beyond a difference of opinion or possible medical malpractice" and instead "suggest that the defendants knew the plaintiff fell, hit his head and was experiencing severe pain but disregarded the potential risk to his health or safety by laughing off his injury and sending him away without assessing or addressing his condition." Dkt. No. 20 at 8. Cases as early as Farmer and Estelle clearly establish that refusing medical

treatment for an incarcerated person who may have suffered a serious injury is unconstitutional. Similarly, the plaintiff relies on Greeno to describe his allegations against Jeanpierre related to her treatment between August and November 2021. As the court has explained, the Seventh Circuit recognized in Greeno that prison officials may not "persist[] in a course of treatment known to be ineffective." 414 F.3d at 655. That is exactly what the plaintiff says Jeanpierre did, and the evidence supports such a finding.

Based on those cases and the numerous subsequently-decided cases expounding on an incarcerated person's right to adequate medical treatment, the court finds that Berres and Jeanpierre are not entitled to qualified immunity on the plaintiff's Eighth Amendment claims against them.

E.    Damages

Finally, the defendants assert that the plaintiff's claims for compensatory damages are limited by 42 U.S.C. §1997e(e) because he does not allege a sufficient injury. Dkt. No. 63 at 20–22.[6] They also assert that he did not produce evidence "to support that the Defendants were motivated by any intent to harm [the plaintiff], and he cannot produce sufficient evidence to support any award of punitive damages against them." Id. at 22. They seek summary judgment on the plaintiff's request for compensatory and punitive damages. Id. (citing Trotter v. B & W Cartage Co., Inc., Case No. 05-cv-0205, 2006 WL 1004882, *1 (S.D. Ill. 2006)).

The court will deny the defendants' request for summary judgment on the plaintiff's request for compensatory damages. The plaintiff alleges that because of Berres's and Jeanpierre's inadequate medical treatment, he suffered

---

[6] The defendants initially suggest that §1997e(e) limits the plaintiff's claim of *punitive* damages. Dkt. No. 63 at 20. They later clarify that §1997e(e) bars the plaintiff's request for compensatory damages. Id. at 22.

and continues to suffer headaches, migraines, cuts on his wrists, pain in his hands and wrists and vision problems that require him to wear glasses. This evidence would be sufficient for a jury to determine that the plaintiff is entitled to compensatory damages.

The court also finds the evidence sufficient to allow a jury to determine the amount of punitive damages, if any, to which the plaintiff is entitled. "'[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Andreola v. State of Wisconsin, Case No. 04-C-0282, 2006 WL 2038364, at *3 (E.D. Wis. July 19, 2006) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). The plaintiff alleges that on July 29, 2021, Berres and Jeanpierre provided him no medical treatment despite knowing that he had fallen and hit his head while on a hunger and water strike. He similarly alleges that Jeanpierre refused him alternate pain medication for three months and instead told him to continue taking the medication that he repeatedly told her was not effective. A jury could believe those allegations and conclude that the defendants acted with "evil motive or intent" or with "reckless or callous indifference" to the plaintiff's Eighth Amendment rights.

## III.    Motion for Sanctions (Dkt. No. 85)

The court received the plaintiff's motion for sanctions on November 6, 2023. Dkt. No. 85. The defendants did not respond to it. In support of his motion, the plaintiff reiterates the accusations of perjury levied in his declaration and other response materials. Id. He first reiterates that Jeanpierre lied about being his physician since 2018. Id. at 2. He again provides his incarceration history and says that Jeanpierre began seeing him as a patient

on January 3, 2021. Id. at 2–3. The plaintiff says that Berres lied about whether the plaintiff had informed her on August 17, 2021 about his headaches, migraines and pain in his hands and wrists. Id. at 3. He reiterates that Berres fabricated his medical records, but he provides no evidence in support of that statement. Id. He again says that he was on a three-man restriction in August 2021, but again has not provided the body-worn camera footage that those officers allegedly recorded on August 17, 2021. Id. He reiterates, without elaboration, that Berres "lied about other things as well." Id. The plaintiff alleges that Rymarkiewicz lied about the plaintiff telling him that the plaintiff was having difficulty breathing in his cell on July 29, 2021. Id. at 4. He also says that Rymarkiewicz lied when he averred that the plaintiff never complained about the handcuffs being too tight. Id. Finally, he says that Weinman lied about the plaintiff being able to stand and sit in his wheelchair under his own power on July 29, 2021. Id. He reiterates that he "was dizzy, daze [*sic*], confused, slurred [his] words, and could not stand." Id. The plaintiff concludes that "in one way or another the defendents [*sic*] lied under perjury whether in their declaration's [*sic*] or interrogatories[] or video footage's [*sic*]." Id. at 5. He seeks "attorney fee's, with sanctions expense's as [the court] see's fit [*sic*]." Id.

The plaintiff filed his motion under Federal Rule of Civil Procedure 56(h). Under that rule, if the court is "satisfied that an affidavit or declaration is submitted in bad faith or solely for delay," the court "after notice and a reasonable time to respond . . . may order the submitting party to pay the other party the reasonable expenses . . . it incurred as a result" or otherwise appropriately sanction the submitting party. Fed. R. Civ. P. 56(h).

Sanctions are not warranted against any defendant. The plaintiff first says that Jeanpierre lied about how long she has been the plaintiff's treating physician. Jeanpierre acknowledged this error in another of the plaintiff's cases in which she is a defendant. See Case No. 22-cv-706-WED. In that case, Jeanpierre submitted a declaration on June 20, 2023 stating that she had been the plaintiff's physician since 2018. Id., Dkt. No. 35. On September 18, 2023, Jeanpierre submitted an amended declaration correcting that error. Id., Dkt. No. 57. Magistrate Judge Duffin found this error to be "immaterial to the case" and denied the plaintiff's motion for sanctions based on the error. Id., Dkt. No. 59.

Jeanpierre submitted her declaration with the identical error in this case on August 14, 2023—before she had recognized and corrected that error in Case No. 22-cv-706. Although she has not submitted an amended declaration in this case, this court agrees with Judge Duffin that the error is immaterial and not worthy of sanctions against Jeanpierre. There is no suggestion that the error was intentional or meant to mislead the plaintiff or delay this case, and it has caused no delay.[7] Had the plaintiff not mentioned the error, the court would have found no need to address it.

The "lies" that the plaintiff accuses the other defendants of are disputes of fact. The plaintiff cites no evidence beyond his own declaration suggesting that the defendants lied in their declarations. Nor does he explain how the defendants submitted these disputes of fact in bad faith or to delay the

---

[7] There *has* been delay in the case. Due to the number and nature of the summary judgment documents and this court's calendar and administrative duties, it has taken the court over a year and a half to rule on the summary judgment motion. But that delay is due to the court's obligations, not Jeanpierre's error.

proceedings. At most, these inconsistencies can be explained by the passage of time, as the court explained above. _Supra_, Section II.C.3. Failures in memory are not "lies." Minor, immaterial inconsistencies are not "lies." And a dispute about the facts of a case is not a basis for sanctions against either party. But it is a reason to deny a motion for summary judgment, as the court explained above. If there is a trial, the plaintiff will be free to argue to the court or a jury that any discrepancies relate to a witness's credibility. But they are not a basis for sanctions.

Nor does the plaintiff request a specific or valid monetary amount. He seeks attorney's fees, but he is not represented by an attorney. He asks for reasonable expenses, but he provides no reason why he is entitled to expenses for filing this motion. He says it took him "2 hours and a half putting this togather [*sic*] this motion." Dkt. No. 85 at 5. But the plaintiff's motion for sanctions merely reiterates the allegations of perjury that the plaintiff repeatedly made in his response brief, his response to the defendant's proposed findings of fact, his own proposed facts and his declaration. His motion is nothing more than repetition of allegations he made in multiple other documents.

The plaintiff has offered no valid reason to sanction the defendants or to provide him any amount of expenses. The court will deny his motion for sanctions.

## IV. Conclusion

The court **DENIES** the plaintiff's motion for sanctions. Dkt. No. 85.

The court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 62.

The court **DENIES** defendant Dixie Berres's motion for summary judgment on the plaintiff's Eight Amendment claim regarding his medical treatment on July 29, 2021.

The court **GRANTS** defendant Berres's motion for summary judgment on the plaintiff's Eighth Amendment claim regarding his medical treatment on and around August 17, 2021.

The court **DENIES** defendant Cheryl Jeanpierre' motion for summary judgment on the plaintiff's Eight Amendment claims regarding his medical treatment on July 29, 2021, and on and around August 17, 2021 through November 1, 2021.

The court **GRANTS** defendant Robert Weinman's motion for summary judgment on the plaintiff's Eighth Amendment claims of deliberate indifference.

The court **GRANTS** defendant Robert Rymarkiewicz's motion for summary judgment on the plaintiff's Eighth Amendment claims of deliberate indifference and excessive force related to July 29, 2021.

The court **DISMISSES** defendants Weinman and Rymarkiewicz.

The court will enter a separate order scheduling a status conference to determine the next steps in this case.

Dated in Milwaukee, Wisconsin this 14th day of July, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**